# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEBRA JEAN MILKE,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN,[*]
*Respondent-Appellee*.

No. 07-99001

D.C. No.
CV-98-00060-
PHX-RCB

OPINION

Appeal from the United States District Court
for the District of Arizona
Robert C. Broomfield, Senior District Judge, Presiding

Argued and Submitted
November 3, 2010—San Francisco, California

Filed March 14, 2013

Before: Alex Kozinski, Chief Judge, Jerome Farris
and Carlos T. Bea, Circuit Judges.

Opinion by Chief Judge Kozinski;
Concurrence by Chief Judge Kozinski

---

[*] Charles L. Ryan is substituted for his predecessor, Dora B. Schriro, as Director of the Arizona Department of Corrections, pursuant to Fed. R. App. P. 43(c)(2).

## SUMMARY[**]

### Habeas Corpus/Death Penalty

The panel reversed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder, conspiracy to commit murder, child abuse and the kidnapping of her young son.

Petitioner Milke's conviction was based largely on the testimony of Police Detective Saldate, who allegedly obtained her confession. The panel held that the state remained unconstitutionally silent instead of disclosing information about Det. Saldate's history of misconduct and accompanying court orders and disciplinary action. The panel held that the state court's failure to comply with *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio* v. *United States*, 405 U.S. 150 (1972), resulted in a decision by the state post-conviction court that was contrary to clearly established Supreme Court law, and that the state post-conviction court so misread the evidence documenting the state's *Brady* violations that its decision was based on an unreasonable determination of the facts. As a result of these two failings, the panel could not accord deference to the state court's decision under the Anti-Terrorism and Effective Death Penalty Act.

Reviewing the *Brady* claim on the merits, the panel first held that evidence in Det. Saldate's personnel file, documenting the detective's lack of compunction about lying

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

during the course of his official activities, was favorable to Milke's defense and likely would have affected the sentence. The panel next held that state knew of the evidence in the personnel file and had an obligation to produce the documents, and that there is a reasonable probability that disclosure of the evidence would have led to a different result.

The panel remanded with instructions that the district court grant a conditional writ of habeas corpus setting aside the conviction and sentence. The panel also ordered the district court to order the state to provide Milke's counsel with Det. Saldate's police personnel records covering all of his years of service. The panel further ordered that, after the state has turned over the records, it shall provide a statement under oath certifying that all records have been disclosed and none have been omitted, lost or destroyed, otherwise the district court shall hold an evidentiary hearing to determine whether and why any records have not been produced. Afterwards, the district court shall order Milke released unless the state decides to retry her. The panel retained jurisdiction over any appeal arising from this remand.

Finally, the panel ordered the clerk of this court to send copies of this opinion to the U.S. Attorney for the District of Arizona and to the Assistant U.S. Attorney General of the Civil Rights Division, for possible investigation into whether Det. Saldate's conduct, and that of his supervisors and other state and local officials, amounts to a pattern of violating the federally protected rights of Arizona residents.

Chief Judge Kozinski concurred to comment on this "troubling case." He would reverse the district court's finding that Milke knowingly waived her *Miranda* rights

because any confession was extracted illegally. He would set aside the conviction on the separate ground that it relied on an illegally-obtained confession that probably never occurred, and bar use of the so-called confession during any retrial.

## COUNSEL

Lori L. Voepel (argued), Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona; Michael D. Kimerer, Kimerer & Derrick, P.C., Phoenix, Arizona, for Petitioner-Appellant.

Terry Goddard, Attorney General, Kent Cattani, Chief Counsel, Capital Litigation Section and Julie A. Done (argued), Assistant Attorney General, Capital Litigation Section, Phoenix, Arizona, for Respondents-Appellees.

## OPINION

KOZINSKI, Chief Judge:

In 1990, a jury convicted Debra Milke of murdering her four-year-old son, Christopher. The judge sentenced her to death. The trial was, essentially, a swearing contest between Milke and Phoenix Police Detective Armando Saldate, Jr. Saldate testified that Milke, twenty-five at the time, had confessed when he interviewed her shortly after the murder; Milke protested her innocence and denied confessing. There were no other witnesses or direct evidence linking Milke to the crime. The judge and jury believed Saldate, but they didn't know about Saldate's long history of lying under oath and other misconduct. The state knew about this misconduct but didn't disclose it, despite the requirements of *Brady* v.

*Maryland*, 373 U.S. 83, 87 (1963), and *Giglio* v. *United States*, 405 U.S. 150, 153–55 (1972). Some of the misconduct wasn't disclosed until the case came to federal court and, even today, some evidence relevant to Saldate's credibility hasn't been produced, perhaps because it's been destroyed. In the balance hangs the life of Milke, who has been on Arizona's death row for twenty-two years.

## Facts

On the last evening of his short life, Christopher Milke saw Santa Claus at the mall. He woke up the next morning begging his mother to let him go again. Debra agreed and sent Christopher to the mall with her roommate, James Styers. On the way, Styers picked up his friend, Roger Scott. But instead of heading to the mall, the two men drove the boy out of town to a secluded ravine, where Styers shot Christopher three times in the head. Styers and Scott then drove to the mall, where they reported Christopher as missing.

Sunday morning, less than a day into the missing-child investigation, police began to suspect Styers and Scott. It was supposed to be Detective Saldate's day off, but the homicide sergeant in charge of the case called him in. A veteran of the police force, Saldate was confident he could get the truth out of anyone he interrogated. At headquarters he started in on Styers almost immediately, while his partner, Detective Bob Mills, worked on Scott. Shortly before 1 p.m., Saldate joined Mills in interrogating Scott. According to Saldate, Mills and other officers were happy to let a suspect talk, but Saldate's

"style," as he described it, was "a little different"—he preferred a frontal assault. "I knew that I was going to be straightforward with [Scott], I was going to be very truthful with him, but I was going to make sure that whatever he told me was going to jive with the facts."

Soon after Saldate's appearance, Scott broke. He led the detectives to Christopher's body and told them where he and Styers had thrown the unspent ammunition. According to Saldate, Scott said along the way that Debra Milke had been involved.[1] Detective Saldate seized on the statement and flew by helicopter to Florence, Arizona, where Milke had gone to stay with her father and step-family after she learned of Christopher's disappearance.

In Florence, a deputy sheriff invited Milke to headquarters to wait for Saldate. Saldate found Milke waiting in a 15-by-15-foot room of the Pinal County jail. She hadn't been arrested, nor had she been told anything about Christopher. Saldate pushed into the room and introduced himself. He pulled his chair close to Milke, a forearm's length at most, and leaned in even closer. That's when he told her that the police had found her son—dead.

"What, what," Saldate testified Milke said. Saldate also reported that Milke started yelling and "seemed to try crying." But the detective saw through the ploy: "When someone is told that their child was murdered and they start to sob and no tears come to their eyes, it's obviously a way for her to try to make me feel for her, and I didn't buy it. I didn't buy it . . . ."

---

[1] Scott's alleged statement was excluded as hearsay at Milke's trial. Neither Scott nor Styers would testify against Milke.

Saldate placed Milke under arrest and read out her *Miranda* rights. According to Saldate, when Milke started to tell him that she'd complained about Christopher to Styers but never realized Styers would hurt the boy, Saldate shut her down: "I immediately, of course, told her that wasn't the truth and I told her I wasn't going to tolerate that, that I wasn't there to listen to lies, nor did I have the time."

With that, Saldate claims, Milke opened up to him about the most intimate details of her life. He testified that, in the span of just thirty minutes, Milke knowingly waived her rights to silence and counsel, reminisced about her high school years when she was "in love with life," feigned tears, calmed down, narrated her failed marriage to Mark Milke—his drug and alcohol abuse and his arrests—recounted how she'd gotten pregnant while on birth control and contemplated an abortion, even making an appointment for one, discussed her fear that Christopher was becoming like his father, confessed to a murder conspiracy, characterized the conspiracy as a "bad judgment call" and solicited Saldate's opinion about whether her family would ever understand. (His view: No.)

By the end of the interview, Saldate had more than just cinched the case against Milke; he'd helped her emotionally. According to Saldate, Milke said she was "starting to feel better and was starting to get some of her self-esteem back." Saldate also testified that Milke asked whether she would be released that night, and when he said she wouldn't be, she asked whether the court could give her "probation for life" if "she could have her tubes tied and never have children again."

Milke has always denied involvement in the murder, and her account of the interrogation differs substantially from Saldate's. Milke testified that she told Saldate she didn't understand the *Miranda* warnings and that, when Saldate asked if she wanted the interrogation taped, she said: "No, I need a lawyer." According to Milke, Saldate ignored her request, instead putting his hands on her knees and proceeding with the interrogation; he then embellished and twisted Milke's statements to make it sound like she had confessed.

The jury had no independent way of verifying these divergent accounts. Saldate didn't record the interrogation, even though his supervisor instructed him to do so. Saldate didn't bring a tape recorder to the interview, nor did he ask anyone to witness the interrogation by sitting in the room or watching through a two-way mirror. Saldate also skipped the basic step of having Milke sign a *Miranda* waiver. Not even Saldate's interview notes made it into court: Saldate testified that he destroyed them after writing his official report three days after the interrogation.

The jury thus had nothing more than Saldate's word that Milke confessed. Everything the state claims happened in the interrogation room depends on believing Saldate's testimony. Without Saldate's testimony, the prosecution had no case against Milke, as there was no physical evidence linking her to the crime and neither of her supposed co-conspirators—Styers and Scott—would testify against her. But Saldate was an experienced witness and his account of Milke's purported confession proved convincing. The jury found Milke guilty of murder, conspiracy to commit murder, child abuse and kidnapping. The judge sentenced her to death.

\*        \*        \*

Normally that would be the end of the matter. Right or wrong, a jury's credibility determinations are entitled to respect. But the Constitution requires a fair trial, and one essential element of fairness is the prosecution's obligation to turn over exculpatory evidence. *See United States* v. *Bagley*, 473 U.S. 667, 674–75 (1985); *Giglio*, 405 U.S. at 153–55; *Brady*, 373 U.S. at 87. This never happened in Milke's case, so the jury trusted Saldate without hearing of his long history of lies and misconduct.

The Appendix contains summaries of some of Saldate's misconduct and the accompanying court orders and disciplinary action. This history includes a five-day suspension for taking "liberties" with a female motorist and then lying about it to his supervisors; four court cases where judges tossed out confessions or indictments because Saldate lied under oath; and four cases where judges suppressed confessions or vacated convictions because Saldate had violated the Fifth Amendment or the Fourth Amendment in the course of interrogations. And it is far from clear that this reflects a full account of Saldate's misconduct as a police officer. *See* pp. 24–25 *infra*. All of this information should have been disclosed to Milke and the jury, but the state remained unconstitutionally silent.

## Discussion

## I.  Antiterrorism and Effective Death Penalty Act

Principles of comity and federalism, as articulated by Congress in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), require federal courts to treat the

decisions of the state courts with deference. But when state courts interpret federal law incorrectly, or fail to apply it at all, a federal court may intervene.

Under AEDPA, we may grant habeas relief if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or if the proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254 (d)(2). A state court decision that provides no explanation is entitled to AEDPA deference, *Harrington* v. *Richter*, 131 S. Ct. 770, 784 (2011), but a state court decision that fails to apply the correct controlling authority is "contrary to . . . established Federal law" and not entitled to AEDPA deference, *Benn* v. *Lambert*, 283 F.3d 1040, 1051 (9th Cir. 2002) (internal quotation marks omitted); *Shackleford* v. *Hubbard*, 234 F.3d 1072, 1077 (9th Cir. 2000) (internal quotation marks omitted).

*Brady* and its progeny require the state to disclose all material evidence that could exculpate the defendant, including evidence that could be used to impeach one of the prosecution's witnesses or undermine the prosecution's case. Despite Milke's persistent complaints at trial and on appeal that impeachment evidence was withheld, the state court never complied with *Brady*. This omission resulted in a decision by the state post-conviction court that was contrary to clearly established law as announced by the Supreme Court. 28 U.S.C. § 2254(d)(1). Further, the state post-conviction court so misread the evidence before it documenting the state's *Brady* violations that its decision was

based on "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). As a result of these two failings, we cannot accord AEDPA deference to the state court's decision.

## A. *Brady* Claim in State Court

**1.** The law requires the prosecution to produce *Brady* and *Giglio* material whether or not the defendant requests any such evidence. *Strickler* v. *Greene*, 527 U.S. 263, 280 (1999); *United States* v. *Agurs*, 427 U.S. 97, 107 (1976). Even though Milke wasn't required to request impeachment evidence from Saldate's personnel file—or elsewhere—she did so at trial by issuing a subpoena duces tecum.[2] The subpoena requested Saldate's "entire personnel file" including "all records of any Internal Affairs investigations . . . relating to his technique or methods of interrogation, violations of Miranda rights and/or improprieties during the course of interrogation, if any." The state trial court quashed the subpoena except for some records of Saldate's training and documents describing police department policies, which were submitted for in camera review.

In post-conviction proceedings, Milke argued that her "right to a fair trial" had been compromised by her inability to get access to impeachment evidence in Saldate's personnel file. She asserted that the "truthfulness and veracity" of Saldate were "material" to her case and that, under federal and state law, "the right of confrontation and cross-

---

[2] The subpoena duces tecum isn't in the record, but the record does contain the Phoenix Police Department's motion to quash the subpoena. That motion reproduces three paragraphs from the subpoena. We quote from that reproduction, which is the state's uncontested account of the subpoena.

examination is an essential and fundamental requirement for the kind of fair trial, which is this country's constitutional goal." Milke argued that she had been denied her constitutional right to cross-examine Saldate because the state did not give her access to impeachment evidence in his file. She blamed the trial court for "refusing to permit the full impeachment of the interrogating officer." Earlier in the petition, she also asserted that the trial court had "imped[ed] defense counsel's ability to impeach Saldate." The prosecution didn't make the requisite disclosures, and the trial court didn't order the prosecution to do so.

Accompanying her impeachment-evidence claim, Milke attached documents from cases in which Saldate had committed misconduct. *See* Appendix. None of the documents had been disclosed by the state at trial. In four of the cases, state judges threw out indictments or confessions because Saldate had lied to a grand jury or a judge. In *State* v. *Reynolds*, for example, the judge ordered a new probable cause finding largely because the defendant "was denied his right to due process and a fair and impartial presentation of the evidence" as a result of Saldate's lying under oath to a grand jury. Order Granting Mot. for New Finding of Probable Cause, *State* v. *Reynolds*, CR88-09605 (Ariz. Super. Ct. Feb. 27, 1989).

In four cases, judges threw out confessions or vacated convictions because Saldate had violated suspects' *Miranda* and other constitutional rights during interrogations, often egregiously. In one case, for example, Saldate testified that he interrogated a suspect who was strapped to a hospital bed, incoherent after apparently suffering a skull fracture. Transcript of Motions and Trial at 23–25, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. May 31, 1983). The state

introduced the suspect's statement at his first trial, Order Granting Mot. for New Trial, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. July 26, 1984), despite the fact that, when interviewed by doctors, the suspect didn't know his own name, the current year or the name of the president, Pet. for Post-Conviction Relief, Attachment A at 6, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. Nov. 14, 1983). At the suspect's retrial, the court suppressed "those statements made by the defendant to Armando Saldate." Order Granting Mot. to Suppress, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. Nov. 26, 1984). The state made no mention of any of this evidence, even though (or perhaps because) a critical question in Milke's case was whether Saldate ignored Milke's request for an attorney. And, despite this trove of undisclosed impeachment evidence, the post-conviction court rejected Milke's claim that she'd been denied access to impeachment material.

Milke's complaints to the post-conviction court followed her assertions, earlier in her petition, that the state had engaged in "repeated instances of prosecutorial misconduct" by failing to disclose evidence in a timely manner, thus denying her "due process, a fair trial, and a reliable sentencing determination." Milke reminded the post-conviction court that "egregious misconduct occurs where the prosecutor's manipulation of evidence is likely to have an important effect on the jury's determination." To support this proposition, she cited the Supreme Court's discussion of the *Brady* disclosure obligation in *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 647 (1974). Indeed, Milke's reference to "egregious misconduct" comes directly from *DeChristoforo*'s use of that phrase to discuss *Brady*. *See id.* at 647–48 (referring to the "sort of egregious misconduct held in . . . *Brady* to amount to a denial of constitutional due process").

Milke again raised the impeachment-evidence claim when she petitioned the Arizona Supreme Court to review the denial of post-conviction relief. She alleged that the judge "denied defense counsel unfettered access to Saldate's personnel records" and, as a result, allowed Saldate's version of the supposed confession to go "essentially unchallenged." This error resulted in a "one-sided presentation of evidence" and "impeded [the jury's] ability to fully and fairly assess the credibility of both [Milke] and Saldate." The Arizona Supreme Court summarily denied the petition.

**2.** In examining the reasonableness of the state courts' decisions, we look to "the last *explained* state-court judgment" on this claim. *Ylst* v. *Nunnemaker*, 501 U.S. 797, 805 (1991); *accord Avila* v. *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). In Milke's case, that judgment was the post-conviction trial court's denial of her claim. We conclude that the post-conviction court's decision is both "contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), and "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). As a result, it doesn't preclude us from reaching the merits of the *Brady* claim.

**a.** *Contrary to clearly established Federal law.* Long-established Supreme Court precedent holds that the prosecution must turn over exculpatory evidence to the defense. *See Brady*, 373 U.S. at 87; *see also Bagley*, 473 U.S. at 674–78. This doctrine applies to impeachment evidence as well. *Giglio*, 405 U.S. at 154–55; *see also Bagley*, 473 U.S. at 676. In *Giglio*, the prosecution's case "depended almost entirely" on the testimony of an unindicted co-conspirator. *Giglio*, 405 U.S. at 151, 154. Without his testimony, "there could have been no indictment and no evidence to carry the

case to the jury." *Id.* at 154. The co-conspirator gave his testimony only after being offered immunity from prosecution, but the prosecution didn't disclose, until after the trial, that the witness had been offered immunity. *Id.* at 151–52. According to the Supreme Court, "the jury was entitled to know" about the offer in considering the testimony. *Id.* at 155. The prosecution's failure to disclose its offer of immunity violated the defendant's due process right to a fair trial. *Id.* The Court reversed the conviction and remanded for a new trial. *Id.*

*Giglio*'s requirement that the state disclose impeachment evidence is well-established and should have controlled the post-conviction court's ruling on Milke's claim. As in *Giglio*, Milke's prosecutor failed to turn over impeachment evidence about the key witness, whose testimony was essential to the case. The undisclosed evidence included court orders from state judges who had taken action against the prosecution in numerous cases because of Saldate's false statements under oath as well as the *Miranda* and other constitutional violations he committed during interrogations. *See* Appendix. The evidence also included a personnel record documenting a five-day suspension where Saldate's supervisors had caught him in a lie and concluded that his credibility was compromised. *See* pp. 28–29 *infra*. The state didn't turn over the suspension report from the personnel file until federal habeas proceedings.

The court documents and the information in the personnel file fit within the broad sweep of *Giglio*, and it was the prosecutor's "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles* v. *Whitley*, 514 U.S. 419,

437–38 (1995). What happened here is more akin to active concealment.

The state court applied the wrong legal authority in resolving Milke's claim. Instead of recognizing the state's constitutional obligation to turn over impeachment evidence under *Giglio*, the post-conviction judge said she didn't have "specific information as to how the trial court 'refused' to permit 'full impeachment'" but guessed that "the claim of err [sic] relates to precluding the defendant from having access to all of Det. Saldate's personnel records." The court found this claim "not colorable" because Milke "fail[ed] to explain why the information was validly discoverable and how it relates to 'full impeachment' of Det. Saldate." But material impeachment evidence isn't just discoverable; under *Giglio*, it must be disclosed unilaterally as a matter of constitutional right.

Milke's claim was straightforward: She couldn't effectively cross-examine Saldate because the state had failed to disclose significant impeachment evidence. At trial, she subpoenaed Saldate's personnel file hoping to gain access to the impeachment evidence to which she was entitled even without a request, and hoping that the evidence in the file could lead to further impeachment evidence elsewhere. The state moved to quash the subpoena, then failed in its duty to disclose impeachment evidence from the file—and elsewhere—despite the requirements of *Brady* and *Giglio*. The trial court quashed the subpoena, except for documents relating to Saldate's training and those describing police department policies, which were produced for in camera inspection. The court documents Milke presented in post-conviction proceedings showing Saldate's misconduct—misconduct that should have been disclosed by

the state—suggested that the personnel file would contain even more.

Instead of examining this claim in light of *Giglio*—asking whether the evidence was favorable, whether it should have been disclosed and whether the defendant suffered prejudice, *see Strickler*, 527 U.S. at 281–82—the state court focused on the discoverability of the evidence and the specificity of the claim. This is not the inquiry called for by long-standing Supreme Court caselaw. Because the state court focused on the wrong questions in denying Milke's impeachment-evidence claim, it applied the wrong legal framework. Its decision is thus "contrary to . . . clearly established Federal law" and unworthy of AEDPA deference. *See Benn*, 283 F.3d at 1051; *Shackleford*, 234 F.3d at 1077.

**b.** *Unreasonable determination of the facts.* The state court's decision is also not entitled to AEDPA deference because it seriously mischaracterized key evidence that supported Milke's claim. Section 2254(d)(2) authorizes federal habeas relief when the state-court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Such unreasonable determinations "come in several flavors," one of them being "where the fact-finding process itself is defective." *Taylor* v. *Maddox*, 366 F.3d 992, 1000, 1001 (9th Cir. 2004).

Here, the state court's fact-finding process was defective in two distinct ways. The first defect resulted from the prosecution's suppression of a suspension report contained in Saldate's personnel file. The report was clearly available to the state and it unquestionably constituted *Brady* and *Giglio* evidence of the most egregious kind, yet the state suppressed

it for more than a decade. When it was finally disclosed in federal court in 2002, the report showed that Saldate had suffered a five-day suspension for accepting sexual favors from a female motorist and then lying about it. That Saldate was disciplined for lying on the job obviously bears on his credibility and qualifies as *Giglio* evidence. The report also discloses that Saldate had no compunction about abusing his authority with a member of the public, a vulnerable woman who, like Milke, found herself alone with him and under his control. The state offers no excuse for failing to turn over the report before the trial, nor can we imagine any legitimate reason for this failure. After all, the state did finally produce it when forced to do so by an order of the district court.

The prosecution's suppression of this report in state court distorted the fact-finding process, forcing the state judge to make her finding based on an unconstitutionally incomplete record. This is not a situation where the record was incomplete because of anything petitioner did or failed to do. The prosecution had an "inescapable" constitutional obligation under *Brady* and *Giglio* to produce the evidence. *Kyles*, 514 U.S. at 438. Its failure to comply with that requirement rendered the fact-finding "process employed by the state court . . . defective." *See Taylor*, 366 F.3d at 999. "[I]n light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2)—evidence that was materially incomplete due to the prosecution's misfeasance—the state court's fact-finding was fatally undermined by the absence of evidence that the state was required by *Brady* and *Giglio* to produce.

By withholding key evidence that it had a duty to produce, the prosecution induced a defect that causes us to "more than merely doubt whether the process operated

properly." *Taylor*, 366 F.3d at 1000. We can be certain it didn't. "[A]ny appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* The state court's finding thus amounted to an unreasonable determination of the facts under section 2254(d)(2).[3]

The second defect in the state court's fact-finding process was its failure to consider all the evidence that *was* presented to it. We have held that, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id.* at 1001. In short, we can't accord AEDPA deference when the state court "has

---

[3] We note an alternative theory under which a federal court could consider Saldate's suspension report, even though it wasn't first presented in state court: It's an open question whether *Cullen* v. *Pinholster*, 131 S. Ct. 1388, 1398 (2011), applies to evidence that is suppressed by the prosecution in state proceedings yet introduced on federal habeas in support of a *Brady* claim already adjudicated by the state courts. *See Gonzalez* v. *Wong*, 667 F.3d 965, 999–1001, 1013–17 (9th Cir. 2011) (W. Fletcher, J., concurring); *Pinholster*, 1388 S. Ct. at 1417 n.5 (Sotomayor, J., dissenting) ("I assume that the majority does not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself."); *id.* at 1417–18 ("Consider, for example, a petitioner who diligently attempted in state court to develop the factual basis of a claim that prosecutors withheld exculpatory witness statements in violation of *Brady* . . . ."). Because we conclude that the withholding of the report distorted the fact-finding process so as to render the state-court finding defective, we need not consider whether the report could be considered on federal habeas under this alternative theory.

before it, yet apparently ignores," evidence that is "highly probative and central to petitioner's claim." *Id.*

Milke presented the state court with hundreds of pages of court records from cases where Saldate had committed misconduct, either by lying under oath or by violating suspects' *Miranda* and other constitutional rights during interrogations. Had these cases been brought to the jury's attention, they would certainly have cast doubt on Saldate's credibility. In addition to serving as impeachment evidence, they also buttressed Milke's repeated claim that she'd been prejudiced by denial of access to Saldate's personnel file, where more impeachment evidence could be expected to reside. This trove of court documents was critical to Milke's claim but ignored by the post-conviction court.

In reviewing the exhibits attached to Milke's post-conviction petition, Judge Cheryl K. Hendrix, who was also the trial judge, was "unable to find a reference to the type of evidence that is allowed under Rule 608 to impeach the credibility of a witness." That is no doubt because she grossly misapprehended the nature and content of the documents that Milke presented. Even though the judge claimed to have reviewed the exhibits, she referred to the collection of court documents as containing mere "motions and testimony from other cases in which Det. Saldate was the interrogating officer. It establishes nothing. The filing of a motion to suppress does not mean the police officer engaged in improprieties."

Had these been merely motions and testimony, that would be true; anyone can make unsubstantiated allegations of misconduct. But seven of the cases included court orders finding that Saldate had lied under oath or violated the Fifth

or the Fourth Amendments during interrogations. Multiple judicial determinations that Saldate lied in performing his official functions and violated suspects' constitutional rights would have been highly relevant where the state's case rested on his testimony. That Milke's evidence contained court orders, rather than just "motions and testimony," is a significant, objective fact that the state court either misapprehended or ignored. Either way, the court's error resulted in an unreasonable determination of the facts. These overlooked court orders are "highly probative and central to petitioner's claim." *Taylor*, 366 F.3d at 1001.

Had the state post-conviction judge realized that the documents contained judicial findings of Saldate's mendacity and disregard for constitutional rights, she may well have recognized their relevance as impeachment evidence that had not been disclosed as required by *Giglio*. After all, the judge acknowledged that Milke could have used the court records to question Saldate about "specific instances of prior conduct" if the information was "probative of the detective's character for truthfulness." And this evidence certainly was, though the court seemed unaware of it.

While the court held that "defense counsel would have been bound by the detective's answers" to the questions about these instances of misconduct, the documents would still have been valuable. With court orders in hand, defense counsel would have had a good-faith basis for questioning Saldate about prior instances where he had lied on the witness stand. *See Foulk* v. *Kotz*, 673 P.2d 799, 801–02 (Ariz. Ct. App. 1983). If Saldate admitted the lies, his credibility would have been impaired. If he denied them, he would have exposed himself to a perjury prosecution. If he claimed he couldn't remember, defense counsel could have shown Saldate the

documents to refresh his memory. *See* Ariz. R. Evid. 612; *State* v. *Hall*, 504 P.2d 534, 537 (Ariz. Ct. App. 1973). And if Saldate still couldn't recall, the jury would have had reason to doubt, not only his veracity, but his memory as well. These court orders would have been a game-changer for Milke, but the state court failed to grasp their significance because it was apparently unaware that the documents contained judicial findings rather than mere allegations.

The post-conviction court also erred in holding that court orders documenting Saldate's *Miranda* and other constitutional violations—which also weren't disclosed—"would have been inadmissible extrinsic evidence on a collateral matter" and "would have been inadmissible to show that the detective engaged in the same 'misconduct' in this case." This ruling violated Milke's due process rights because the evidence would have been highly relevant to the critical question of whether Saldate violated *Miranda* in Milke's case.

The issue of Saldate's *Miranda* compliance was strenuously disputed at trial. The judge instructed the jury to discount any of Milke's statements to police "unless you determine beyond a reasonable doubt that the Defendant made the statements voluntarily." In anticipation of this instruction, both sides staked out positions as to whether Saldate violated *Miranda*. In closing arguments, defense counsel reminded the jury that Saldate would continue to speak to suspects even after they'd invoked the right to counsel—"He told you that."—and urged the jury to use Saldate's failure to record the interrogation as "a further piece of the puzzle for you to take into account when considering the voluntariness of the statements and considering the integrity of an asserted confession." The prosecutor also

thought this issue was important. On cross-examination, he confronted Milke about her supposed invocation of the right to counsel: "You actually didn't ask for an attorney in reality, did you?" Milke insisted that she did. The prosecutor asked again before sarcastically driving home his point: "I take it you said that out loud?" Later, in closing, the prosecutor insisted that Saldate had followed the law relating to interrogations and that, "if [Milke] had requested an attorney [Saldate] would have noted it." Clearly, both sides considered it highly relevant whether Saldate had complied with *Miranda* in obtaining Milke's supposed confession.

Given that the jury was being asked to determine whether Saldate had complied with *Miranda*, judicial determinations that Saldate had engaged in a pattern of *Miranda* and other constitutional violations during interrogations would have been highly probative. Their exclusion would have violated due process by denying Milke "a meaningful opportunity to present a complete defense." *Crane* v. *Kentucky*, 476 U.S. 683, 690 (1986) (internal citation omitted). Saldate's documented history of such violations could have shown the jury that he habitually circumvented *Miranda*, as Milke argued in state and federal court. Likewise, these repeated violations should have been admitted to demonstrate that Saldate planned, from the outset, to conduct an illegal interrogation by confronting Milke alone, without a tape recorder. Repeated judicial findings that Saldate had violated constitutional rights in other interrogations would have been highly relevant to the jury's deliberations about what took place when he and Milke were alone behind closed doors, after which he emerged claiming to have extracted a confession. Exclusion of the evidence of Saldate's pattern of *Miranda* violations, had this evidence been offered by the

defense at trial, would have violated Milke's right to due process.

When the state court fails "to consider key aspects of the record," it makes an "unreasonable determination of the facts." *Taylor*, 366 F.3d at 1008 (internal quotation marks omitted). "[W]e may no more uphold such a factual determination than we may set aside reasonable state-court fact-finding." *Id.* The state court's failure to recognize that Milke had attached judicial findings of misconduct to her petition for post-conviction relief was an unreasonable determination of the facts and thus presents a separate basis for refusing to accord AEDPA deference to the state court's denial of Milke's impeachment-evidence claim.

## II. *Brady* Claim in Federal Court

### A.  District Court

In district court, Milke again pressed the issue of the undisclosed impeachment evidence and finally succeeded in prying information out of Saldate's personnel file. She presented the court records documenting Saldate's lies and *Miranda* and other constitutional violations, which she had obtained in state post-conviction proceedings. She argued that, "[b]y summarily dismissing Petitioner's claims without hearing, the [post-conviction] trial court effectively denied defense counsel the means to buttress this evidence through further discovery of Detective Saldate's entire personnel and disciplinary file." She stressed that "the credibility and veracity" of Saldate were "key issues" in the case.

Milke requested all documents (1) "concerning the evaluation of Detective Armando Saldate's (#1875)

performance of his duties," (2) concerning "investigations or disciplinary actions taken or contemplated against Detective Armando Saldate" and (3) assessing Saldate's "credibility, strengths and/weaknesses as a witness and/or possible effects on a judge or jury." The district court ordered the state to produce for in camera review "Saldate's personnel file and any Internal Affairs investigation(s) of Saldate" as well as "any assessments of Saldate's credibility maintained by [the Phoenix Police Department]."

The state produced just two of Saldate's annual reviews even though Saldate had held the job for twenty-one years before Milke's trial. All of Saldate's annual reviews should have been produced as they all apparently contained assessments of Saldate's job performance that bore on his credibility. The state has never offered an explanation for its failure to produce the remaining reports. In addition, the state produced a notice of Saldate's five-day suspension for taking sexual liberties with a motorist he stopped and then lying to his supervisors about it. The state has not explained why this highly relevant report was not produced before Milke's trial.

The district judge was rightly concerned that so few documents had been produced in response to his order. He ordered the state attorney general's office to check with the Phoenix Police Department whether all records had been produced. Six days later, the Phoenix police chief and one of his lieutenants wrote to the attorney general's office saying "every document subject to [the] order has in fact been produced." The police department's statement was not under oath and offered no explanation for how someone could work for the Phoenix Police Department for two decades and have such a short paper trail. The district court didn't pursue the matter.

## B.  Court of Appeals

Milke's opening brief in our court complained that she had been denied access to Saldate's file:

> After cross-examining Saldate, defense counsel sought discovery of his personnel records for impeachment purposes. Judge Hendrix ordered an *in camera* inspection of Saldate's file *only* as to any training he received over the prior five years, and any Phoenix Police Department policies, procedures or guidelines for interrogations in effect on December 3, 1989[, the day of the interrogation].  None of this material was provided to defense counsel.

(Internal citations omitted.)  Milke also complained that the state judge, who oversaw both trial and post-conviction proceedings, "disallowed discovery of Saldate's personnel file" at both stages of the case and "would not allow defense counsel access to anything in Saldate's personnel files." Milke's brief further noted that it wasn't until federal habeas that Milke "finally obtained" "portions of Saldate's personnel files."

Her opening brief didn't cite *Brady* or *Giglio*, but it did cite their descendant, *United States* v. *Kiszewski*, 877 F.2d 210 (2d Cir. 1989):

> [R]eliable evidence of a law enforcement officer's misconduct in unrelated cases is admissible to impeach that officer's credibility, particularly "where credibility is

the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents." *United States v. Kiszewski*, 877 F.2d 210, 216 (2nd [sic] Cir. 1989).

(Emphasis omitted.)

The prosecution in *Kiszewski* didn't turn over any *Brady* material, so, shortly before trial, the defense subpoenaed the personnel files of two FBI agents. 877 F.2d at 215. The government admitted that one of the agents had a few complaints against him, including one for which he had been reprimanded. *Id.* Still, the government turned over nothing and the district court refused to compel in camera review. *Id.* The Second Circuit found a *Brady* violation. *Id.* at 216. *Kiszewski* has since been cited for the proposition that, under circumstances like Milke's, the trial court must do more than take the government's word that *Brady* material doesn't exist—the court must review the files in question.[4]

Milke further argued this claim in her reply brief where she said that "*Brady* v. *Maryland* and its progeny require the State to disclose material impeachment evidence" and that

---

[4] *See, e.g.*, *United States* v. *Bland*, 517 F.3d 930, 935 (7th Cir. 2008) (citing *Kiszewski*'s holding that a "court should not rely on the government's representations regarding *Brady* materiality of potential impeachment evidence where credibility is the central issue in the case"); *United States* v. *Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992) (summarizing *Kiszewski* as holding in camera review appropriate "when, after prosecutor's denial that any *Brady* material existed, prosecutor revealed that FBI agent witness's file contained complaints that he was 'on the take'").

"[t]he state court's ruling was clearly contrary to *Brady*."
(Internal citation omitted.)

Having established that Milke's claim is not barred by the
state court decision (which was both contrary to clearly
established federal law and based on an unreasonable
determination of the facts), that her claim was preserved and
that she raised it before us, we turn to the merits.

## C. *Brady* Claim on the Merits

Due process imposes an "inescapable" duty on the
prosecutor "to disclose known, favorable evidence rising to
a material level of importance." *Kyles*, 514 U.S. at 438.
Favorable evidence includes both exculpatory and
impeachment material that is relevant either to guilt or
punishment. *See Bagley*, 473 U.S. at 674–76; *Giglio*,
405 U.S. at 154. The prosecutor is charged with knowledge
of any *Brady* material of which the prosecutor's office or the
investigating police agency is aware. *See Youngblood* v.
*West Virginia*, 547 U.S. 867, 869–70 (2006) (per curiam).

A *Brady* violation has three elements. *Strickler*, 527 U.S.
at 281–82. First, there must be evidence that is favorable to
the defense, either because it is exculpatory or impeaching.
*Id.* at 281–82. Second, the government must have willfully
or inadvertently failed to produce the evidence. *Id.* at 282.
Third, the suppression must have prejudiced the defendant.
*Id.*

**1.** *Favorable evidence.* Any evidence that would tend to
call the government's case into doubt is favorable for *Brady*
purposes. *See Strickler*, 527 U.S. at 290. Saldate's personnel
file contained an internal investigation report showing he had

been suspended for five days. The report explains that Saldate stopped a female motorist who had a faulty taillight and possibly an outstanding warrant. He let her go without checking her warrant. Let her go isn't quite accurate. Saldate suggested they move to a less conspicuous spot and then followed her to it. Once there, he leaned into her car, "took liberties" with her and acted in a manner "unbecoming an officer." She offered to meet him later for an "act of sexual intercourse." Saldate showed up for the rendezvous, but the woman didn't. Instead, someone—perhaps the woman, once she got free of Saldate—reported Saldate's misconduct to the police.

Questioned by investigators, Saldate steadfastly lied about the incident until he failed a polygraph test. "[Y]our image of honesty, competency, and overall reliability must be questioned," one of Saldate's supervisors wrote in a report signed by the city manager and the chief of police. The facts of Saldate's misconduct, his lies to the investigators and this assessment by his supervisor would certainly have been useful to a jury trying to decide whether Saldate or Milke was telling the truth. Not only does the report show that Saldate has no compunction about lying during the course of his official duties, it discloses a misogynistic attitude toward female civilians and a willingness to abuse his authority to get what he wants. All of this is highly consistent with Milke's account of the interrogation.

The court orders Milke's lawyers uncovered are also favorable evidence that was available to the state but the prosecution did not disclose. As Milke argued to the state post-conviction court, the orders show that Saldate "has lied under oath in order to secure a conviction or to further a prosecution." Those cases all involved the Maricopa County

Attorney's Office and the Phoenix Police Department—the same agencies involved in prosecuting Milke:

● *State* v. *King*. On direct, Saldate told Maricopa County prosecutor Paul Rood that the defendant hadn't been unwilling to answer questions during the interrogation. On cross, the defense counsel read back Saldate's own report showing that the defendant had, in fact, said he wasn't going to answer any more questions. The trial judge threw out the portion of the confession that followed the suspect's request to end the interview: "[T]he statements made up to the time when the defendant advised the detective he no longer wished to answer his questions are admissible. Thereafter they're not admissible." Transcript of Voluntariness Hearing at 35, *State* v. *King*, CR90-00050 (Ariz. Super. Ct. Jun. 22, 1990).

● *State* v. *Reynolds*. The judge found that Saldate's false statements to the grand jury "denied [the defendant] his right to due process and a fair and impartial presentation of the evidence." Order Granting Mot. for New Finding of Probable Cause, *State* v. *Reynolds*, CR88-09605 (Ariz. Super. Ct. Feb. 27, 1989). Two false statements particularly worried the judge: Saldate told the grand jury that the victim's son couldn't remember at what time he saw defendant enter the house, drag the victim upstairs and then leave; the son could say only that it was late at night, according to Saldate. That statement was false. In fact, the son told detectives that the defendant left the apartment about 8 p.m.; the son knew this because defendant turned off the Garry Shandling Show on the way out. Saldate's omission was critical because other witnesses had seen the victim alive after midnight; if the defendant left around 8 p.m., it proved he hadn't killed the victim in their fight.

In the same case, the grand jury asked Saldate whether the defendant was drunk at the time of the crime, which bore on whether the defendant could form the specific intent for first-degree murder. Saldate testified that defendant had said he was drinking but not drunk. However, defendant had told Saldate that he'd been drinking beer and smoking marijuana, and was too drunk to remember some of the events from that night. The judge found that "a fair presentation was not made in connection with the evidence concerning the identification of the defendant by the victim's son," and that "the evidence was not fully and fairly presented with regard to defendant's possible intoxication." Order Granting Mot. for New Finding of Probable Cause, *supra*. Based largely on Saldate's two false statements, the judge threw out the finding of probable cause.

• *State* v. *Rodriguez*. Saldate told a grand jury that the murder victim had been shot four times, even though it was, as the judge wrote, "undisputed" that the victim was shot only once. Order Granting Redetermination of Probable Cause, *State* v. *Rodriguez*, CR 161282 (Ariz. Super. Ct. Nov. 20, 1986); Mot. for Redetermination of Probable Cause at 4, *State* v. *Rodriguez*, No. CR 161282 (Ariz. Super. Ct. Oct. 20, 1986). The Maricopa County Attorney's Office said it had never intended to claim there was more than one shot. Resp. to Mot. for Redetermination of Probable Cause at 4, *State* v. *Rodriguez*, No. CR 161282 (Ariz. Super. Ct. Nov. 13, 1986). Instead of blaming Saldate for the false statement, the prosecution "[took] issue with the transcription of the grand jury proceeding, for surely the testifying detective, Armando Saldate, of the Phoenix Police Department, and/or this State's attorney would have caught and corrected such an incorrect representation." *Id.*

The trial judge didn't buy it. He found that the "reporter's notes and the transcript of the Grand Jury" were accurate and that Saldate had, in fact, said there were four shots. Order Granting Mot. for Redetermination of Probable Cause, No. CR-161282 (Ariz. Super. Ct. Nov. 20, 1986). As a result of this false statement, the judge ordered a redetermination of probable cause.

● *State* v. *Rangel*. A judge agreed with defendant's claim that Saldate and a prosecutor (Lawrence Turoff) misled a grand jury by selectively recounting defendant's statements. Order Granting Mot. to Remand, *State* v. *Rangel*, No. CR89-08086 (Ariz. Super. Ct., Oct. 16, 1989); Mot. to Remand at 5–7, *State* v. *Rangel*, No. CR89-08086 (Ariz. Super. Ct. Sept. 15, 1989). The judge held that Saldate's and the prosecutor's statements had materially affected the grand jury's deliberation and remanded the case for a new finding of probable cause.

The above orders make out a *Giglio* violation on their own, but Milke also presented additional *Giglio* evidence—documents from four cases where courts found Saldate had violated the Fifth Amendment or the Fourth Amendment in the course of his interrogations. Again, those cases all involved the Maricopa County Attorney's Office and the Phoenix Police Department:

● *State* v. *Yanes*. Saldate admitted interrogating a suspect who was strapped to a hospital bed, incoherent after apparently suffering a skull fracture. Transcript of Motions and Trial at 23–25, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. May 31, 1983). When interviewed by doctors, the suspect didn't know his own name, the current year or the name of the president, Pet. for Post-Conviction Relief,

Attachment A at 6, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. Nov. 14, 1983), but the prosecutor nonetheless presented the suspect's statement to Saldate at trial, Order Granting Mot. for New Trial, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. July 26, 1984). The court vacated the conviction and ordered a new trial. *Id.* At the suppression hearing for the new trial, the court suppressed "those statements made by the defendant to Armando Saldate." Order Granting Mot. to Suppress, *State* v. *Yanes*, No. CR-130403 (Ariz. Super. Ct. Nov. 26, 1984).

● *State* v. *Conde*. Saldate interrogated a suspect in intensive care who was intubated and connected to intravenous lines. Saldate testified that the suspect was drifting "in and out" of consciousness; several times, Saldate had to shake him "to get his attention." Transcript of Pretrial Motions at 17–18, *State* v. *Conde*, Nos. CR 88-05881(B), CA 90-475 (Ariz. Super. Ct. Oct. 24, 1989). Nonetheless, Saldate read him the *Miranda* warnings and went on with the interrogation. "I really don't know whether he wasn't responding because he didn't understand his rights or wasn't responding because of the medication he was on," Saldate testified. By Saldate's own admission, "it was obvious that [the defendant] was in pain." The nurse told the suspect that she couldn't give him more pain medicine until after he finished talking to Saldate. When the case came to trial in 1989, the court held the statement from this interrogation "involuntary and inadmissible," as the Arizona Court of Appeals noted in a published opinion three years later. *State* v. *Conde*, 846 P.2d 843, 845 (Ariz. Ct. App. 1992).

● *State* v. *King*. Saldate kept asking questions long after the defendant indicated he no longer wanted to answer. The court ruled that those statements were inadmissible.

Transcript of Voluntariness Hearing at 35, *supra*. This is the same case discussed earlier in the context of Saldate's false statements. *Supra* p. 30.

• *State* v. *Jones*. In the course of a murder investigation, Saldate directed an officer to place a juvenile by himself in an interrogation room, where the juvenile was handcuffed to a table. Order Granting Mot. to Suppress at 2, *State* v. *Jones*, No. CR 90-05217 (Ariz. Super. Ct. Nov. 29, 1990). This, despite the fact that, in the trial court's view, "the police clearly had no information linking the Defendant to the murder or disappearance of [the victim]," and even the Maricopa County Attorney's Office conceded that it had no probable cause for the detention. *Id.* The court suppressed the murder confession as "the fruit of the illegal arrest" and condemned the juvenile's illegal detention and the interrogation that followed as "a show of flagrant misconduct." *Id.* at 3.

The court order suppressing the confession was dated November 29, 1990, just after Milke's October 12, 1990, conviction but before her January 18, 1991, sentencing. Though too late to affect the jury's verdict, this order should have been produced under *Giglio* because Saldate's credibility remained a live issue. On the day of sentencing, the court entertained Milke's motions for a new trial and for judgment notwithstanding the verdict. The judge denied both motions, explaining that there was no error in allowing Saldate's statement about the confession. The judge said she "does not believe that the Defendant made a request for an attorney prior to or during her questioning by Detective Saldate" and that, while "a good deal of time and effort was expended by the defense to discredit the reports made by Detective Saldate as to other witnesses[, t]hose efforts to

discredit his note-taking and report-writing and accuracy were not successful." Had the Maricopa County Attorney's Office produced the suppression order in *Jones*, Milke could have used it in support of her motions for a new trial and for judgment notwithstanding the verdict, and the outcome might well have been different.

The *Jones* order—and the other orders that the state failed to produce—would likely also have affected the judge's decision whether to sentence Milke to death. As the Supreme Court made clear in *Brady* itself, evidence must be disclosed if it is "material either to guilt *or to punishment*." *Brady*, 373 U.S. at 87 (emphasis added). Saldate's credibility certainly was material to punishment. For example, Milke's sentencing allocution went into detail about the legal errors that led to her conviction. In pleading for her life, she was particularly critical of Saldate. She said: "I'm disappointed that the Court allowed the use of a purported confession to be used against me when there wasn't any evidence to prove this alleged confession." Milke continued:

> Although Mr. Saldate testified that he follows laws and guidelines, he does not. He didn't follow a direct order from a sergeant to tape-record an interview with me. An[] officer with over 20 years of experience should also know better than to interview a female suspect in a closed room without a witness. . . . This crime was very serious and I feel Mr. Saldate was extremely irresponsible. It is true my *Miranda* rights were read to me and I was apprised of my Fifth Amendment privilege to have counsel present. However, when I

> requested such a privilege, he immediately
> ignored me as if I said nothing.

Had Milke been able to present Saldate's menagerie of lies
and constitutional violations, her allocution may well have
resonated with the sentencing judge and persuaded her to
spare Milke's life.　Indeed, the trial judge herself
acknowledged that she was considering "legitimate questions
concerning guilt" as a mitigating factor, only to find she had
no such questions about guilt.　Had the judge known about
Saldate's documented misconduct, she may well have
developed such "legitimate questions concerning guilt."

　　**2.** *Suppression*.　The second element of a *Brady*
violation is the willful or inadvertent failure of the prosecutor
to disclose evidence favorable to the defendant. *See Strickler*,
527 U.S. at 281–82; *see, e.g.*, *Giglio*, 405 U.S. at 154
("[W]hether the nondisclosure was a result of negligence or
design, it is the responsibility of the prosecutor.").　We have
long held that the government has a *Brady* obligation "to
produce any favorable evidence in the personnel records" of
an officer.　*United States* v. *Cadet*, 727 F.2d 1453, 1467 (9th
Cir. 1984).　A defendant doesn't have to make a request for
exculpatory or impeachment evidence:　"[T]he duty to
disclose [exculpatory] evidence is applicable even though
there has been no request by the accused, and . . . the duty
encompasses impeachment evidence as well as exculpatory
evidence."　*Strickler*, 527 U.S. at 280 (internal citation
omitted).　We've also held that "the government has a duty to
examine personnel files upon a defendant's request for their
production." *United States* v. *Henthorn*, 931 F.2d 29, 31 (9th
Cir. 1991).　If the prosecution isn't sure whether material in
a personnel file rises to the *Brady* threshold, "it may submit
the information to the trial court for an *in camera* inspection."

*Cadet*, 727 F.2d at 1467–68 (internal quotation marks omitted) (quoting *United States* v. *Gardner*, 611 F.2d 770, 775 (9th Cir. 1980)). As the Supreme Court held in *Kyles* v. *Whitley*, "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." 514 U.S. at 439.

The state is charged with the knowledge that there was impeachment material in Saldate's personnel file. After all, the state eventually produced some of this evidence in federal habeas proceedings and has never claimed that it could not have disclosed it in time for Milke's trial. There can be no doubt that the state failed in its constitutional obligation of producing this material without any request by the defense.

The state also had an obligation to produce the documents showing Saldate's false and misleading statements in court and before grand juries, as well as the documents showing the Fifth Amendment and Fourth Amendment violations he committed during interrogations. The prosecutor's office no doubt knew of this misconduct because it had harmed criminal prosecutions. The police must have known, too.

Indeed, the timing of the suppression order in *Jones* underscores the cavalier attitude of the Maricopa County Attorney's Office toward its constitutional duty to disclose impeachment evidence. *See* pp. 34–36 *supra*. The prosecution argued against the *Jones* suppression motion on November 16, 1990, and lost, resulting in the suppression of the murder confession. Order Granting Mot. to Suppress at 2, *State* v. *Jones*, No. CR 90-05217 (Ariz. Super. Ct. Nov. 29, 1990). The prosecutor's office then began preparing for a second hearing, which would determine whether key physical evidence—"the body, shell casings, and shovel"— would

also be suppressed.  *State* v. *Jones*, Nos. 1 CA-CR 90-1922,
1 CA-CR 91-0345 at 2, 7 (Ariz. Ct. App. Nov. 10, 1992).[5]
All this was happening between the time of Milke's
conviction on October 12, 1990, and her sentencing on
January 18, 1991.  That means even as Milke's attorney was
working hard to stave off a death sentence and win a new trial
or judgment notwithstanding the verdict, the prosecutor's
office and the police were actively dealing with Saldate's
misconduct in another murder case.  *Id.* at 7.

When the *Jones* court suppressed the murder confession,
this must surely have reminded the Maricopa County
Attorney's Office and the Phoenix Police Department of
Saldate's propensity to commit misconduct.  Indeed, Paul
Rood, the prosecutor in *Jones*, was also the prosecutor in
*King*, where in June 1990, Saldate had been caught in a lie
about violating *Miranda*.  *See* pp. 30, 33–34 *supra*.  And, at
about the same time as *King*, Rood also received a
suppression motion in *State* v. *Mahler*, a Saldate case in
which the defendant made what the Arizona Court of Appeals
called "an unequivocal invocation to remain silent."  No. 1
CA-CR 90-1890, at 4 (Ariz. Ct. App. Oct. 2, 1992).  In that
case, Saldate kept speaking with the defendant after the
invocation, claiming that "he [Saldate] did not want an
admission but that he just wanted Mahler's side of the story."
*Id.*  The Arizona Court of Appeals held that "Officer
Saldate's intent was clear . . . he wanted additional statements
from Mahler.  This conduct violated Mahler's right to remain

---

[5] The second hearing would take place on January 23, 1991, just days
after Milke's sentencing.  The trial court decided to suppress the physical
evidence, and the court of appeals affirmed both suppression orders.  *State*
v. *Jones*, Nos. 1 CA-CR 90-1922, 1 CA-CR 91-0345 at 1, 2, 7 (Ariz. Ct.
App. Nov. 10, 1992).

silent." *Id.* The trial court didn't suppress the confession, and the defendant was convicted. But the Court of Appeals held that the confession should not have been admitted and remanded the case. *Id.* at 2, 6.

Because the Court of Appeals in *Mahler* didn't hand down its decision until 1992, after Milke's trial, we don't count this case as *Brady* material. But *Mahler* is still significant because the suppression motion, filed on May 30, 1990, came just about the time that Rood was handling Saldate's misconduct in *King*. The fact that Rood was litigating yet another instance of Saldate's misconduct in the summer of 1990—albeit one where the trial court went the state's way, before being reversed—is all the more reason to conclude that Rood and his colleagues in the Maricopa County Attorney's Office were intimately familiar with Saldate's pattern of misconduct.

And, as the state absorbed the loss of the *Jones* confession in November 1990 and prepared arguments to save the physical evidence in *Jones* from suppression, it must have occurred to Rood or *someone* in the prosecutor's office or the police department (or both) that Saldate was also the key witness in the high-profile case against Debra Milke—a case where the defendant was still at trial, actively fighting for her life. Yet no one saw fit to disclose this or any of the other instances of Saldate's misconduct to Milke's lawyer.

Even if there somehow weren't actual knowledge of Saldate's misconduct, inadvertent failure to disclose is enough for a *Brady* violation. *See Strickler*, 527 U.S. at 282. That the court documents showing Saldate's misconduct were available in the public record doesn't diminish the state's obligation to produce them under *Brady*. In determining

whether evidence has been suppressed for purposes of *Brady*, our court has asked whether the defendant "has enough information to be able to ascertain the supposed *Brady* material on his own." If so, there's no *Brady* violation. *United States* v. *Aichele*, 941 F.2d 761, 764 (9th Cir. 1991); *see also United States* v. *Bracy*, 67 F.3d 1421, 1428–29 (9th Cir. 1995) (holding criminal history wasn't suppressed because the government "disclos[ed] . . . all the information necessary for the defendants to discover the alleged *Brady* material"); *United States* v. *Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985). Where a defendant doesn't have enough information to find the *Brady* material with reasonable diligence, the state's failure to produce the evidence *is* considered suppression.[6]

Milke was able to discover the court documents detailing Saldate's misconduct only after a team of approximately ten researchers in post-conviction proceedings spent nearly 7000 hours sifting through court records. Milke's post-conviction attorney sent this team to the clerk of court's offices to search for Saldate's name in every criminal case file from 1982 to 1990.[7] The team worked eight hours a day for three and a

---

[6] The Second Circuit came to the same conclusion about the suppression of public records. In *United States* v. *Payne*, 63 F.3d 1200 (2d Cir. 1995), a witness testified that she had packaged drugs for the defendant. *Id.* at 1205. But in her own criminal case, she submitted an affidavit saying she'd had no involvement in the drug trade. *Id.* The defendant knew of the witness's criminal case and could have found the affidavit in the public record. *Id.* at 1208–09. Still, the court rejected the claim that the prosecutor had "no duty to disclose the affidavit . . . because it was in public court records." *Id.* at 1208. The test was whether defense counsel "was aware of facts that would have required him to discover the affidavit through his own diligent investigation." *Id.* at 1209.

[7] Saldate resigned from the police force on July 10, 1990.

half months, turning up 100 cases involving Saldate. Another researcher then spent a month reading motions and transcripts from those cases to find examples of Saldate's misconduct. A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial. Thus, the documents describing Saldate's lies and his *Miranda* and other constitutional violations during the course of interrogations were suppressed.

Indeed, suppression of the personnel file and suppression of the court documents run together. Had Milke been given the full run of evaluations in Saldate's personnel file, she would have found cases Saldate worked on. For example, the 1989 evaluation—one of just two evaluations turned over—lists six high-profile cases Saldate handled. In addition, the personnel file could have disclosed cases so corrupted by Saldate's misconduct that they were unfit for court. As Milke argued, the court records she found in post-conviction proceedings were just "the 'tip of the iceberg' of Detective Saldate's interrogation/interview practices." But without the full personnel file, we can't know, even now, the full extent of the misconduct that could have been used to impeach Saldate.

**3.** *Prejudice.* To find prejudice under *Brady* and *Giglio*, it isn't necessary to find that the jury would have come out differently. *Kyles*, 514 U.S. at 434. It suffices that there be "a reasonable probability of a different result" as to either guilt or penalty. *Id.* (internal quotation marks omitted). Prejudice exists "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).

Milke's alleged confession, as reported by Saldate, was the only direct evidence linking Milke to the crime. But the confession was only as good as Saldate's word, as he's the only one who claims to have heard Milke confess and there's no recording, written statement or any other evidence that Milke confessed. Saldate's credibility was crucial to the state's case against Milke. It's hard to imagine anything more relevant to the jury's—or the judge's—determination whether to believe Saldate than evidence that Saldate lied under oath and trampled the constitutional rights of suspects in discharging his official duties. If even a single juror had found Saldate untrustworthy based on the documentation that he habitually lied under oath or that he took advantage of women he had in his power, there would have been at least a hung jury. Likewise, if this evidence had been disclosed, it may well have led the judge to order a new trial, enter judgment notwithstanding the verdict or, at least, impose a sentence less than death. The prosecution did its best to impugn Milke's credibility. It wasn't entitled, at the same time, to hide the evidence that undermined Saldate's credibility.

Also at issue was Saldate's claim—again, unsupported by evidence—that Milke waived her *Miranda* rights and didn't ask for a lawyer. Beyond its effect on Saldate's credibility, evidence of Saldate's falsifications and his disregard of *Miranda*, would have been highly relevant to the determination of whether Milke's alleged confession had been lawfully obtained. The suppression of evidence of Saldate's lies and misconduct thus qualifies as prejudicial for purposes of *Brady* and *Giglio*.

## III.     Conclusion

Milke is entitled to habeas relief. We therefore **REVERSE** the decision of the district court and **REMAND** with instructions to **GRANT** a conditional writ of habeas corpus setting aside her convictions and sentences. Prior to issuing the writ, the district court shall order the state to provide Milke's counsel with Saldate's police personnel records covering all of his years of service, including records pertaining to any disciplinary or Internal Affairs investigations and records pertaining to performance evaluations. If the state believes that any of the materials it is ordered to provide are not relevant to *Brady* or *Giglio*, it may present them to the district court in camera, and the district court shall review them to determine whether they are relevant to *Brady* or *Giglio*, as explicated in our opinion. Defense counsel shall be allowed to see the documents and to argue why each might be *Brady* or *Giglio* material. The district court may, in its discretion, enter a protective order requiring all contested documents to be filed under seal and to be designated "For Attorneys' Eyes Only," and setting such other conditions as the district court finds necessary and proper, while the district court decides whether the contested materials are relevant to *Brady* or *Giglio*.

After the state has turned over these records, it shall provide a statement under oath from a relevant police official certifying that all of the records have been disclosed and none has been omitted, lost or destroyed. If a relevant police official is unable or unwilling to provide such a certification, the district court shall hold an evidentiary hearing to determine whether any records have not been produced, and, if so, why. Petitioner's counsel shall be given a reasonable

period of discovery prior to the hearing. This panel retains jurisdiction over any appeal arising from this remand.

Upon production of the certification described above or the conclusion of the evidentiary hearing, the district court shall order Milke released unless the state notifies the court within 30 days that it intends to retry Milke, and actually commences Milke's retrial within 90 days.

The clerk of our court shall send copies of this opinion to the United States Attorney for the District of Arizona and to the Assistant United States Attorney General of the Civil Rights Division, for possible investigation into whether Saldate's conduct, and that of his supervisors and other state and local officials, amounts to a pattern of violating the federally protected rights of Arizona residents.

**Appendix: Detective Armando Saldate, Jr.'s Misconduct**

| Incident | Impeachment Evid. Type | Misconduct Allegations | Police Department Action |
|---|---|---|---|
| Internal Affairs Investigation (Aug. 31, 1973) | Lying to Internal Affairs Investigators | Saldate stopped a motorist who had a faulty taillight and possibly an outstanding warrant. He let her go without checking her warrant. She offered him a kiss. The two went to a "less conspicuous place" where Saldate "leaned inside her car, kissed her and deliberately began making advances and took liberties." They agreed to meet later for sex. Saldate lied about the incident to his supervisors. The lies were discovered, however, when the supervisors administered a polygraph examination. Saldate then confessed the details. | In a disciplinary write-up, signed by the police chief and the city manager, Saldate was told that "because of this incident, your image of honesty, competency, and overall reliability must be questioned." Saldate received a five-day suspension. |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|---|---|---|---|
| *State* v. *King*, CR90-00050 (Ariz. Super. Ct. Jun. 22, 1990) | Lying under oath<br><br>and<br><br>Fifth Amendment Violation | Saldate testified on direct examination that the defendant never indicated he didn't want to answer questions. On cross-examination, defense counsel impeached Saldate with the detective's own report. Saldate admitted the false statement—and that he had continued to interrogate the defendant despite defendant's demand to cease questioning. | The trial court held inadmissible all statements made after the defendant said he wanted to cut off questioning. |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|---|---|---|---|
| *State* v. *Reynolds*, CR88-09605 (Ariz. Super. Ct. Feb. 27, 1989) | Lying under oath | Saldate made false statements to a grand jury that undercut the defendant's alibi and made the defendant look more culpable than he otherwise would have. | The trial court held that "the defendant was denied his right to due process and a fair and impartial presentation of the evidence by the manner in which the [Grand Jury] proceeding was conducted." The court ordered a new finding of probable cause. |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|------|------------------------|------------|-------------|
| *State* v. *Rodriguez*, CR 161282 (Ariz. Super. Ct. Nov. 20, 1986) | Lying under oath | Saldate told the grand jury that the victim had been shot four times even though it was "undisputed" that the victim had been shot only once. The state blamed the court reporter; it claimed Saldate never said there was more than one shot, and if he did, he "surely . . . would have caught and corrected such an incorrect representation." | The court concluded that Saldate had made a false statement, not that the court reporter had erred: "[T]he reporter's notes and the transcript of the Grand Jury both reflect that the testimony of the State's witness [Saldate] was that the deceased was shot four times" even though "the facts in this case are undisputed that the deceased was shot only one time." The trial court ordered a redetermination of probable cause. |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|------|------------------------|------------|-------------|
| *State* v. *Rangel*, CR89-08086 (Ariz. Super. Ct. Oct. 16, 1989) | Lying under oath | When Saldate testified before the grand jury, he omitted some of defendant's statements in such a way as to make defendant look more culpable. | The court held that the actions of Saldate and the prosecutor "made the presentation of evidence to the grand jury less than fair and impartial resulting in a denial of a substantial procedural right to the defendant." The trial court ordered a new finding of probable cause and remanded the case. |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|------|------------------------|------------|-------------|
| *State* v. *Jones*, No. CR 90-05217 (Ariz. Super. Ct. Nov. 29, 1990) | Fourth Amendment Violation | Saldate ordered a juvenile to be detained in an interrogation room, where he was handcuffed to a table. This, despite the fact that the trial court found there was no probable cause for the detention and "the police clearly had no information linking the Defendant to the murder or disappearance of [the victim]." | The trial court called the detention that Saldate ordered "a show of flagrant misconduct" and ruled that the murder confession must be suppressed as "the fruit of the illegal arrest." |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|------|------------------------|------------|-------------|
| *State* v. *Yanes*, CR 130403 (Ariz. Super. Ct. July 26, 1984) | Fifth Amendment Violation | Saldate admitted interrogating a suspect who was strapped to a hospital bed, incoherent and disoriented, after apparently suffering a skull fracture. When interviewed by doctors, the suspect did not know his own name, the year or the name of the president, but the state nonetheless presented the suspect's statement at trial. | The court vacated defendant's conviction and ordered a new trial. At the suppression hearing for the new trial, the court granted defendant's motion to suppress "those statements made by the defendant to Armando Saldate." |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|---|---|---|---|
| *State* v. *Conde*, 846 P.2d 843 (Ariz. Ct. App. 1992) | Fifth Amendment Violation | Saldate interrogated a defendant in intensive care who was intubated and connected to intravenous lines. Saldate testified that the defendant was drifting "in and out" of consciousness. Nonetheless, Saldate read the *Miranda* warnings and went on with the interrogation. "I really don't know whether he wasn't responding because he didn't understand his rights or wasn't responding because of the medication he was on," Saldate testified. Several times, Saldate had to shake defendant "to get his attention." By Saldate's own admission, "it was obvious that [defendant] was in pain." The nurse told defendant that she couldn't give him more pain medicine until after he finished talking to Saldate. | The trial court ruled in 1989 that statements from this interrogation — the first of two in the hospital — were "involuntary and inadmissible." |

| Case | Impeachment Evid. Type | Misconduct | Court Order |
|------|------------------------|------------|-------------|
| *State* v. *Mahler*, No. 1 CA-CR 90-1890 (Ariz. Ct. App. Oct. 2, 1992) | Fifth Amendment Violation | Defendant made an "unequivocal invocation" of his right to remain silent. Instead of stopping the interrogation, Saldate pushed on, telling defendant that "he did not want an admission but that he just wanted [defendant's] side of the story." | The Arizona Court of Appeals held that "Officer Saldate's intent was clear . . . he wanted additional statements from [defendant]. This conduct violated [defendant's] right to remain silent." The court suppressed all statements defendant made after he invoked his right to silence, and remanded the case. |

Chief Judge KOZINSKI, concurring:

This is a disturbing case. There's no physical evidence
linking Debra Milke to the crime, and she has maintained her
innocence since the day she was arrested. Neither of the men
who actually did the killing testified against Milke. Roger
Scott refused to testify because his "testimony would not be
what he felt was the truth." After spending many years on
death row, James Styers continued to insist that "Debbie had
nothing to do with it and thats [sic] the truth." The *only*
evidence linking Milke to the murder of her son is the word
of Detective Armando Saldate, Jr.—a police officer with a
long history of misconduct that includes lying under oath as
well as accepting sexual favors in exchange for leniency and
lying about it.

Equally troubling are Saldate's unorthodox interrogation
methods. Saldate has obtained confessions from people who
were intoxicated, hospitalized and on pain medication. *See*
Op. 32–33; Appendix. Saldate once ordered a juvenile to be
detained in an interrogation room, where he was handcuffed
to a table, even though the police had "no information linking
the Defendant" to a crime. Order Granting Mot. to Suppress
at 2, *State* v. *Jones*, No. CR 90-05217 (Ariz. Super. Ct. Nov.
29, 1990). The trial court suppressed the resultant murder
confession and called the illegal detention "a show of flagrant
misconduct." *Id.* at 3. It later suppressed the resultant
physical evidence, too, and the Arizona Court of Appeals
affirmed both suppression orders, condemning the
"purposeful arrest lacking in probable cause, for the improper
motive of investigation." *State* v. *Jones*, Nos. 1 CA-CR 90-
1922, 1 CA-CR 91-0345, at 1, 6 (Ariz. Ct. App. Nov. 10,
1992). In another case, Saldate admitted interrogating a
suspect who was strapped to a hospital bed, incoherent after

apparently suffering a skull fracture. *See* Transcript of Trial, *State* v. *Yanes*, No. CR 130403, at 23–25 (Ariz. Super. Ct. May 31, 1983).

Then there's Saldate's practice of disregarding the right to remain silent when invoked by suspects he's questioning. The Arizona Court of Appeals described one such example where a defendant "made an unequivocal invocation to remain silent," yet Saldate pushed on with the interrogation, insisting that he only wanted the defendant's "side of the story." *State* v. *Mahler*, No. 1 CA-CR 90-1890, at 4 (Ariz. Ct. App. Oct. 2, 1992). The trial court didn't suppress the confession, and the defendant was convicted of murder. *Id.* at 1–2. But the Arizona Court of Appeals held "[t]his conduct violated Mahler's right to remain silent" and remanded his case because of the illegally obtained confession. *Id.* at 2, 4, 6. In Milke's case, Saldate testified that he doesn't have to stop talking to suspects just "because they asked for an attorney. That would be ridiculous . . . ." What I find ridiculous is that this man—with his track record of trampling basic constitutional rights—is sent to interrogate a suspect without a tape recorder, a video recorder, a witness or any other objective means of documenting the interrogation.

Saldate's supervisor asked him to record Milke's interrogation, yet Saldate didn't even take a tape recorder with him. When he arrived in Florence, Arizona, where Milke was waiting for him, he didn't obtain a recorder there either, even though he knew they were readily available. Saldate claims that Milke refused to have the conversation recorded, but admits that he "basically didn't want to record it anyway." And why not? Because "a tape recorder is an obstacle for [him] to get to the truth" and so "it's [his]

practice never to use a tape recorder." Of course, being left with no recording is an obstacle for *us* to get to the truth, but Saldate tells us not to worry: "[The] conversation was going to be noted by me in a truthful manner, so there was really no need for tape recording." Right.

No other officer was present for the interrogation; no one watched through a two-way mirror; no hidden camera or microphone captured what happened inside the interrogation room. Saldate never asked Milke to put her confession in writing or initial a single sentence acknowledging she had confessed. Nor did Milke sign a *Miranda* waiver. Saldate testified that "[t]here was no document . . . we had available to us" where "we could have a suspect sign that they waive their rights." And what of the practice of having a suspect sign the officer's *Miranda* card? "I never knew that ever happened," Saldate testified. "Never happened with my case or any other case I was involved in." This, from an officer with twenty-one years on the Phoenix Police force. Soon after the interrogation, Saldate destroyed the notes he supposedly took while questioning Milke, so we have absolutely *nothing* contemporaneous with the supposed confession.

In effect, Saldate turned the interrogation room into a black box, leaving us no objectively verifiable proof as to what happened inside. All we have are the conflicting accounts of a defendant with an obvious reason to lie and a detective whose disdain for lawful process is documented by one instance after another of lying under oath and other misconduct.

No civilized system of justice should have to depend on such flimsy evidence, quite possibly tainted by dishonesty or

overzealousness, to decide whether to take someone's life or liberty. The Phoenix Police Department and Saldate's supervisors there should be ashamed of having given free rein to a lawless cop to misbehave again and again, undermining the integrity of the system of justice they were sworn to uphold. As should the Maricopa County Attorney's Office, which continued to prosecute Saldate's cases without bothering to disclose his pattern of misconduct.

Indeed, given Saldate's long history of trampling the rights of suspects, one wonders how Saldate came to interrogate a suspect in a high-profile murder case by himself, without a tape recorder or a witness. And how could an interrogation be concluded, and a confession extracted, without a signed *Miranda* waiver? In a quarter century on the Ninth Circuit, I can't remember another case where the confession and *Miranda* waiver were proven by nothing but the say-so of a single officer. Is this par for the Phoenix Police Department or was Saldate called in on his day off because his supervisors knew he could be counted on to bend the rules, even lie convincingly, if that's what it took to nail down a conviction in a high-profile case?

It's not just fairness to the defendant that calls for an objectively verifiable process for securing confessions and other evidence in criminal cases. We all have a stake in ensuring that our criminal justice system reliably separates the guilty from the innocent. Letting police get away with manufacturing confessions or planting evidence not only risks convicting the innocent but helps the guilty avoid detection and strike again.

Could the people of Arizona feel confident in taking Milke's life when the only thread on which her conviction

hangs is the word of a policeman with a record of dishonesty and disrespect for the law? Bad cops, and those who tolerate them, put all of us in an untenable position.

Milke may well be guilty, even if Saldate made up her confession out of whole cloth. After all, it's hard to understand what reason Styers and Scott would have had for killing a four-year-old boy. Then again, what reason would they have to protect her if they know she's guilty? But I seriously doubt the jury would have convicted Milke without the purported confession. Indeed, without the confession, there's not enough evidence to support a conviction. Which is why it's very important that the confession be reliable and lawfully obtained.

Both the district judge and the state trial judge found that Saldate was telling the truth when he testified that Milke waived her *Miranda* rights and didn't ask for a lawyer. I discount the state court's finding because it was made with no knowledge of Saldate's repeated instances of lying under oath and other professional misconduct. One hopes the judge would have been more skeptical of Saldate's account had she been aware that Saldate was disciplined for taking advantage of a female motorist and lying about it to his supervisors, and that he habitually lied in court, abused the interrogation process and disregarded *Miranda*.

Nor am I impressed by the district court's finding. The district judge was aware of Saldate's suspension and noted it in passing, Findings and Order at *4, *Milke* v. *Ryan*, No. CV 98-60-PHX-RCB, 2010 WL 383412 (D. Ariz. Jan. 29, 2010), but he didn't specify the nature of the misconduct, nor did he acknowledge that Saldate's supervisors had determined that his "image of honesty, competency, and overall reliability

must be questioned" as a result of the misconduct. It's hard to say he gave it due weight—or any weight at all.

The district judge did note Saldate's *Miranda* violations but, somehow, construed them as supporting Saldate's credibility. The judge reasoned that when Saldate had violated *Miranda* in the past, he had admitted it in his reports: "[Saldate] testified that [Milke] never asked for an attorney. If she had, Saldate would have noted it and included the information in his supplemental report. He had done so in other cases, including cases where he continued to converse with suspects even after they had invoked their right to remain silent or their right to an attorney. In some of these cases evidence was suppressed as a result of Saldate's conduct during the interrogations." *Id.* at \*6 (internal citations omitted). The district court also found that "it was Saldate's practice to note in his reports if a suspect invoked his right to remain silent or his right to an attorney. The fact that his report in this case does not contain such a notation supports his testimony that Petitioner did not ask for an attorney at the outset of the interrogation." *Id.* at \*11.

I find this backward reasoning unpersuasive. This was a high-visibility, high-pressure case, in which Saldate was called in especially and given much responsibility. It is highly doubtful he would have noted an invocation that would have undermined the alleged confession. Far more likely, Saldate had learned from earlier cases that documenting a *Miranda* violation could result in the exclusion of a confession and make him the object of judicial ire. This may also explain why Saldate so hastily destroyed the original notes from the interrogation. If they contained his habitual documentation of *Miranda* and other constitutional violations during the course of interrogation, he

may have thought it wise not to have them available to impeach his official report.

Finally, the district judge said nothing at all about Saldate's numerous instances of lying under oath, which tainted prior criminal cases. I find this omission inexplicable and conclude he must have overlooked them. Had the district judge taken these incidents into account, he might well have made a different finding.

I would reverse the district court's finding that Milke knowingly waived her rights under *Miranda* and *Edwards* v. *Arizona*, 451 U.S. 477 (1981). The "confession," if it was obtained at all, was extracted illegally. There can be no serious claim that admission of the confession was harmless. I would therefore set aside Milke's conviction on the separate ground that it relied on an illegally-obtained confession that probably never occurred, and bar use of the so-called confession during any retrial of Milke.