IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83758-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| MICHAEL GARY ERICKSON, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — In 2018, 19-year-old college sophomore G.C. reported to police that her former stepfather, Michael Erickson, sexually abused her between 2004 and 2009 when she was six to eleven years old. Following a mistrial, Erickson was retried, and a jury convicted him on three counts of rape of a child in the first degree and one count of child molestation in the first degree. He appeals.

As to Erickson's claim that his right to a unanimous jury was violated, we agree that the State did not make an effective election as to counts 1 or 2 for rape of a child and there was neither a Petrich instruction or effective election as to count 4 for child molestation. However, we conclude these errors were harmless. Erickson also challenges the court's denial of his motion to continue the case due to the COVID-19 pandemic as a denial of his constitutional right to a fair trial. He contends the court violated his right to a public trial in several different ways, as well as his right to be present during critical stages. He also

challenges evidentiary rulings preventing cross-examination of a witness and allowing improper character evidence about the victim, claiming these rulings violated his constitutional rights under the confrontation clause and his right to present a defense. Alternatively, he contends that his counsel was ineffective for failing to raise constitutional arguments. Finding no error on any of these bases, we affirm.

FACTS

G.C. was born on August 23, 1998, to Jessica Erickson and Torivio Castaneda. Jessica[1] left Castaneda in 2000 and met Michael Erickson online in 2001. Erickson had a son born in 2000. Jessica and Erickson married, and they had a son of their own in 2003. Jessica and Erickson alternated between day and night shifts, mostly in the grocery store industry, so that one of them could be with their children. They separated and divorced in 2009.

After she finished high school, G.C. went to Western Washington University. In 2017, the fall of her sophomore year at university, G.C. told her basketball coach that she had been abused. Her coach put her in touch with an acquaintance, Claudia Ackerman, who was an advocate at Domestic Violence and Sexual Assault Services in Bellingham, Washington. In 2018, Ackerman contacted Lieutenant Claudia Murphy of the Bellingham Police department. Murphy took G.C.'s complaint, and she referred her report and a transcript of their conversation to the Arlington, Washington, police department for investigation.

---

[1] We refer to Jessica Erickson by her first name only for clarity as she shares the appellant's last name. We intend no disrespect.

The State first filed charges against Erickson in August 2018, then filed a second amended information in November 2019. The second amended information's first three counts are identical to one another. They each allege rape of a child in the first degree committed on "a specific date between on or about the 23rd day of August, 2004, and on or about the 22nd day of August, 2010, in an act separate and distinct from those alleged in the other counts." Each of the three counts of rape of a child alleges Erickson "did have sexual intercourse with GC." The fourth count alleges child molestation in the first degree. It alleges that "in an act separate and distinct from those alleged in the other counts," Erickson had "sexual contact with GC."

Erickson's first trial, in November 2019, ended in a mistrial. Rescheduled for 2020, Erickson's second trial was continued, primarily due to COVID-19. In 2021, Erickson sought a continuance until masks would no longer be necessary. The court denied the motion.

Erickson's second trial was held in November 2021. G.C. testified for two days. She testified that when she was six years old, she and her family moved to a townhome in Granite Falls, Washington, near the school she attended for first and second grade.[2] G.C. testified that "this is when [Erickson] first started to touch me." She testified that "multiple times," always on her parents' bed at the house in Granite Falls, "there were times when he would undress me and times when I would undress myself" and "then he would eventually start touching me on my vagina and use his mouth to touch me too." G.C. said,

---

[2] G.C. presented her testimony chronologically by where she was living and what grade she was in, and she later linked her grade level to her age in years and thus the calendar year.

3

He would use his tongue, he would use his fingers, and he would penetrate me with his fingers too. . . . I remember how much it hurt, because of his fingernails going inside of me. And he would use his tongue on me too . . . he would move his tongue around, and I remember feeling his teeth on me too.

The State asked, "was there more than one time that he put his fingers in you and more than one time that he put his mouth on you?" and G.C. answered "yes." The State asked G.C. to clarify whether Erickson put his tongue outside or inside her vagina, to which she answered, "Inside and outside." G.C. testified that there were instances when she put a pillow over her face as she lay on her back, and there were instances when Erickson put a pillow on her face. At one point, the State asked G.C. to clarify her memory of "the discomfort or the pain from his fingernails and the scratching, in or on what part of your body?", and she answered, "Inside of my vagina." At least one time, G.C. testified, Erickson put "oily stuff" on her "vagina but also on the surrounding area of [her] body" that she now recognized as "lube."

When she was seven years old, in the middle of second grade, G.C. and her family moved to a duplex in Arlington. G.C. testified that Erickson did a lot of things to her at this house: "I mean, there's a lot." "[T]o try to keep this in smaller chunks," the State then asked her about different types of activity, such as playing games. G.C. testified that Erickson played a card game with her where "every time you lost, you had to take your clothes off," and "then I remember that leading into something more after that game." Asked about the general category of games or activities that weren't "overtly sexual in nature," G.C. described

4

during family movie nights, Erickson "would have [her] clip his toenails and his cuticles," shave his back hair, and pop his back pimples.

Asked about other instances of role-playing games, G.C. testified that he tried to hypnotize her, and she went along with it and "was pretending to be under hypnotic state." Erickson told her to pretend she was trying on clothes in a mall and that "[she] needed to take [her] clothes off in order to try [her] new clothes on," so she pretended she was in a changing room, "twirling around in front of him," while naked or mostly naked.

G.C. also testified that at the Arlington house, she remembered him "doing doctor," which entailed "[h]im checking me down in my private areas" while she was "laying on the bed, and he would be checking me - - or saying he was checking me, but he would be touching me again." Asked whether she was clothed "when that would happen," she said did not remember if she was fully naked but remembered not having pants on. She testified that Erickson would sometimes watch her shower, and other times they would be in the shower together, though she didn't remember how many times. She testified as punishment, "there would be times when [Erickson] would spank [her], and [she] would go upstairs on their bed and be on all fours," sometimes clothed, sometimes not. Also as punishment, sometimes she would be asked to stand in the corner, sometimes clothed, sometimes not. G.C. also recalled once being downstairs with the fireplace on, while there was porn on the television, Erickson tied her up with neckties or belts so she couldn't move, though he did not touch her during that incident. Erickson would also touch her with "a white little vibrator"

5

that was "silver with, like, little bumps on it, circles," and he would touch her on her nose, cheek, and "down there," on but not inside her vagina, and she would also touch him with it too.

G.C. also testified that as she got older, one of her last memories of him in the Arlington house was an incident where Erickson casually "just put his hands down my pants . . . just stuck it there and left it there" and then "ma[de] fun of the hair I was growing down there." She testified that she didn't remember how many times he came in or how old she was, but she would put toys in front of her door so she "would hear him before he would come in and would start touching [her]." She also would "wrap [her] hands down by [her] vagina," wrap blankets in between and around her legs, and leave stuffed animals in her legs, to make it more difficult for him touch her while she was sleeping.

Asked about times that Erickson made G.C. touch him, G.C. testified that she didn't recall how old she was but "it started at the Arlington house." The State asked, "Tell us about one of the times that stands out most clearly in your mind," and G.C. described how after playing "the card game" with her, Erickson was sitting in a recliner[3] wearing boxers with a hole in the front and he

> pull[ed] his penis out and touch[ed] himself and show[ed] me how to touch him, and I remember him grabbing my hand and moving it how he was moving it on him. And I remember he - - I don't know when this happened, if it was this incident or the next, because this happened multiple times, but he also would tell me to put my mouth on him, and, like, tell me what he wanted me to do.

---

[3] G.C.'s mother testified that Arlington house held "a big L-shaped couch," not a recliner. G.C. testified that there was a recliner at her biological father's house.

6

G.C. further testified that "every single time we were in this situation, like, him sitting on the recliner and me sitting on the ground next to him, I was, like, really, really scared," and she remembered "sitting there for what felt like forever and staring at the wall and crying and not moving."

The State then questioned G.C. about the times that Erickson made her touch him with her hands. The State asked G.C. if she remembered "details about his penis?" G.C. responded, "Yes, I remember him having a lot of skin on it. So looking back now, I remember him being uncircumcised."[4] In response to the statement, "you said that it happened more than one time that he had you touch him with your hand," G.C. answered, "Yes." As to whether this happened any other place than "sitting in that chair in the living room," G.C. said, "Not that I remember, no."

When the State asked G.C. to "[t]ell us everything you can remember about the times when" G.C. put her mouth on Erickson's penis, G.C. testified that she remembered

> putting my mouth on him, . . . . he even put his hand on my head and moved it up and down on his penis while my mouth was on him. And I remember gagging. I remember it in my mouth. And I remember him ejaculating in my mouth too, and I just remember that warm feeling and how gross it tasted and smelled. I remember running to the bathroom down the hall and spitting it out and crying, because it was so gross, and it made me gag. And this happened multiple times too.

---

[4] G.C.'s mother testified that she also believed Erickson was uncircumcised. Erickson submitted the testimony of his mother and his subsequent wife, a photograph, and the testimony of the policer officer who took the photograph, to prove that he was circumcised at birth.

7

The State asked G.C. if Erickson ejaculated in her mouth more than once. G.C. answered, "I don't remember," then continued, "But I remember one - - like, specifically one time that sticks out in my mind."

The court instructed the jury that "[a] separate crime is charged in each count." It defined sexual intercourse for the counts of rape of a child and sexual contact for the molestation count. And it instructed the jury that, for the rape of a child counts, the State would elect a single act constituting each count that the jury must unanimously agree the State proved. No unanimity instruction was given regarding the single count of molestation. Then, in its closing argument, the State linked categories of sexual intercourse—e.g., digital penetration, putting his mouth on her vagina, making her perform oral sex on him, and him making her touch his penis—to each count charged.

The jury found Erickson guilty of three counts of rape of a child in the first degree as charged in counts 1, 2, and 3 and guilty of one count of child molestation in the first degree as charged in count 4. The court sentenced him to an indeterminate term of 318 months to life. Erickson timely appeals.

## DISCUSSION

Erickson raises multiple issues on appeal. First, he claims the State failed to elect a specific act regarding its three counts of rape of a child and that the court erred by failing to give the Petrich[5] instruction regarding the State's single count of child molestation. He challenges several actions by the court related to COVID-19, including the court's denial of his motion to continue the trial due to

---

[5] State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), overruled in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988)).

COVID-19 and requiring potential jurors to wear masks during jury selection. Erickson also alleges several violations of his right to a public trial: the court's use of the jury assembly room for jury selection, making rulings during jury selection in chambers, and allowing the public to enter or leave the courtroom only during breaks.[6] Finally, he challenges two evidentiary rulings during trial that he claims prevented him from cross-examining a witness about her honesty and improperly admitted character evidence about the victim. He claims the rulings violated his constitutional confrontation clause right and his right to present a defense. Alternatively, he claims ineffective assistance of trial counsel for failing to raise constitutional arguments as to both. Finally, Erickson argues that these errors constituted cumulative error.

I.      Right to a Unanimous Jury Verdict

Erickson argues his convictions must be reversed because the court failed to properly instruct the jury regarding its requirement to agree unanimously that he was guilty of a specific criminal act, and prejudice is presumed. The State argues G.C.'s testimony "presented a single act" as to each count, the court did instruct the jury to unanimously agree, and any error was harmless.

Criminal defendants in Washington have a constitutional right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When the prosecution presents evidence of multiple acts of misconduct that could form the basis of a charged count, either

---

[6] After filing his appeal, Erickson moved this court to remand his case to the trial court to complete the record regarding his public trial right. A commissioner of this court permitted him to amend his opening brief to argue for remand.

the State must elect the act to support a conviction or the court must instruct the jury to agree on a specific criminal act. State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). "An election or instruction that all 12 jurors must agree that the same underlying act has been proved beyond a reasonable doubt assures a unanimous verdict on one criminal act." Id. at 512. A unanimity instruction, also known as a Petrich instruction, is not necessary where the State chooses to elect an act as the basis for conviction. State v. Carson, 184 Wn.2d 207, 229, 357 P.3d 1064 (2015). "Whether or not a unanimity instruction was required in a particular case is a question of law reviewed de novo." State v. Lee, 12 Wn. App. 2d 378, 393, 460 P.3d 701, review denied, 195 Wn. 2d 1032, 468 P.3d 622 (2020).

Courts examine the charges, the evidence, the jury instructions, and the State's closing argument to determine whether the State elected effectively.[7] State v. Kier, 164 Wn.2d 798, 813-14, 194 P.3d 212 (2008). "[A]n election can be made by the prosecuting attorney in a verbal statement to the jury as long as the prosecution 'clearly identifie[s] the act upon which' the charge in question is based." Carson, 184 Wn.2d at 227 (quoting State v. Thompson, 169 Wn. App. 436, 475, 290 P.3d 996 (2012)).

Here, the court did not give a Petrich instruction. Instead, at the State's request, the court gave jury instruction 6, which states, "In alleging that the

---

[7] The analysis depends on whether the crime charged is a multiple acts or alternative means crime. State v. Bobenhouse, 166 Wn.2d 881, 892, 214 P.3d 907 (2009) ("The review standard for whether the failure to provide an unanimity instruction was error hinges on whether we are dealing with an alternative means case or a multiple acts case."). Both child rape and child molestation are multiple act offenses. Id. (RCW 9A.44.073(1) "provides for but one crime, rape of a child."); Coleman, 159 Wn.2d at 511 (molestation analyzed as multiple acts offense).

defendant committed Rape of a Child, the State relies upon evidence regarding a single act constituting each count of the alleged crime. To convict the defendant on any count, you must unanimously agree that this specific act was proved."[8] In its closing argument, the State explained jury instruction 6 regarding jury unanimity this way:

> In order to return verdicts of guilty, you have to be unanimous in making sure that you're talking about the same incident. In other words, you can't have four of you talking about one particular incident, another three of you talking about another incident, and then the other five of you talking about a third incident and return a verdict that way.

The State acknowledged "[t]his instruction is here because, if you were paying close attention to [G.C.'s] testimony, when she was talking about the things the defendant did to her, she said that it happened more than once, many times." The State continued, "And I'm going to assist you in that by linking specific acts that were testified about in the - - in the trial to the charged counts."

> Count 1, when you're talking about the evidence, relates to [G.C.'s] testimony about the defendant penetrating her digitally, putting his fingers in her vagina. That's Count 1.
> Count 2 pertains to her testimony about the defendant putting his mouth on her vagina, performing oral sex on her.
> Count 3 pertains to her testimony about him making her perform oral sex on him.
> And Count 4 pertains to him making her touch his penis. Okay?
> There are the four counts, and there are the four specific allegations that I'm relying on in asking you to find the defendant guilty.

---

[8] The instruction the court gave mirrors the language of WPIC 4.26, Election to Specify a Particular Act, *not* the language of WPIC 4.25, the Petrich instruction. WPIC 4.26 should be used when "there is evidence of multiple distinct occurrences of the crime, the prosecutor may elect to rely upon a specific occurrence." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.26, at 128 (5th ed. 2021) (comment). In contrast, the Petrich instruction, WPIC 4.25, should be used "when the evidence indicates that several distinct criminal acts have been committed, but the defendant is charged with only one count of criminal conduct." WPIC 4.25 at 124 (note on use).

11

A. Rape of a Child

For a charge of rape of a child in the first degree, the State must prove "sexual intercourse with another who is less than twelve years old and the perpetrator is at least twenty-four months older than the victim." RCW 9A.44.073. The definitions section provides that "[s]exual intercourse" (a) "has its ordinary meaning and occurs upon any penetration, however slight," (b) "[a]lso means any penetration of the vagina or anus, however slight, by an object," and (c) also means "any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another." RCW 9A.44.010(14). Jury instruction 8 defined "sexual intercourse" as follows:

> any penetration of the vagina or anus however slight, by an object, including a body part, when committed on one person by another, whether such persons are of the same or opposite sex, or any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

The court further instructed the jury that "[a] separate crime is charged in each count." It instructed that to convict Erickson of counts 1, 2, or 3 of rape of a child in the first degree, "[t]hat on a specific date between" August 23, 2004 and August 22, 2010 "in an act separate and distinct from those alleged in the other counts," Erickson "had sexual intercourse with G.C." Other than the number of the count (1, 2, or 3), these three instructions were identical. As noted above, jury instruction 6 stated the State would rely on evidence of a single act as to each count of rape of a child.

12

Erickson argues that "as for the rape of a child counts, the State did not actually elect." We discuss each count in turn.

### 1. Count 1

In its closing argument, the State told the jury, "Count 1, when you're talking about the evidence, relates to [G.C.'s] testimony about the defendant penetrating her digitally, putting his fingers in her vagina. That's Count 1." The State contends that this was an effective election as it distinguished the type of conduct from the oral sex charged in counts 2 and 3.

But even if the State limited the category of acts charged in count 1 to digital penetration, G.C. testified that "multiple times" in the house in Granite Falls on her parents' bed Erickson "would eventually start touching me on my vagina and use his mouth to touch me too." "He would use his tongue, he would use his fingers, and he would penetrate me with his fingers too." The State asked, "You said that this happened more than one time," and G.C. answered "Yes." She described many different instances of sexual intercourse involving Erickson touching her with his fingers. Sometimes G.C. undressed herself and sometimes Erickson undressed her. There were times G.C. put a pillow over her face and times Erickson put a pillow on her face. There were times a lubricant was used. There were times her underwear was off and times it was on.

G.C. also testified that in the house in Arlington, Erickson played "doctor with me," and said "he was checking me, but he would be touching me again." In that house, G.C. testified she remembered being "upstairs in their master bedroom" and "him telling me had to check me and - - like, a doctor would."

13

Afterwards, she testified, she remembered "having to go pee again and having that same stinging sensation I had at that last house." She also testified he came into her room at night at the Arlington house and "put his hands down my pants."

The State argues on appeal that there "was only a single description of digital penetration which was a description of [Erickson]'s fingernails inside [G.C.'s] vagina." But G.C. did not discuss only one instance; she testified, "he would use his fingers, and he would penetrate me with his fingers too. . . . I remember how much it hurt, because of his fingernails going inside of me."

Moreover, the State did not tell the jury it was electing solely one incident involving Erickson's fingernails—it told the jury count 1 "relates to [G.C.]'s testimony about the defendant penetrating her digitally."[9] And the State, arguing to convict Erickson on count 1 at closing argument, emphasized to the jury that sexual intercourse, "for the purposes of our discussion," means "any penetration . . . however slight":

> First, the evidence pertaining to Count 1 [G.C.] describes as happening in the master bedroom at the house in Granite Falls. She remembers being undressed, sometimes leaving her underwear on.
>
> ....
>
> Again, sometimes her underwear would be on, sometimes off. He would start rubbing her vagina. She remembers the pain, the acute physical sensation of his fingers going into her vagina and specifically how his fingernails felt inside her little body.

---

[9] Sexual intercourse does not require penetration. RCW 9A.44.010(14)(c). However, while the State may have limited count 1 to exclude non-penetrative conduct, such as touching her vaginal area with his fingers without penetration, the evidence was not limited to only one incident of the category of digital penetration.

> She remembers feeling warm oily liquid on her at some points. . . . She remembers having to pee afterwards and feeling a sharp pain when she would urinate.
>
> ....
>
> And there are a couple ways that sexual intercourse is defined here, but for purposes of our discussion regarding Count 1, again, the allegation that he put his fingers inside her vagina, jury instruction number 8 says, "Sexual intercourse means any penetration of the vagina or anus, however slight, by an object, including a body part, when committed on one person by another, whether -- whether such persons are of the same or opposite sex." So we know that that description from [G.C.] satisfies the definition of sexual intercourse.

The State thus did not rely on only one instance involving fingernails, but used the word "sometimes"—"sometimes leaving her underwear on" and "sometimes her underwear would be on, sometimes off." "Sometimes" indicates more than one time.

G.C. testified to multiple instances of digital penetration by Erickson that could satisfy the element of sexual intercourse for rape of a child. Because she testified that these incidents occurred both at the Granite Falls and the Arlington houses, it can be inferred this category of conduct occurred more than one time.[10] The State did not identify for the jury which specific act of this type to rely on to convict Erickson on count 1. We thus conclude that the State did not make an effective election as to count 1.

---

[10] The State established the date range stated in the charges through G.C.'s testimony, which tied where she was living to what grade she was in, and her grade level to her age and thus the calendar year.

## 2. Count 2

As with the other identical counts of rape of a child, the court instructed the jury that the State would elect a "single act" to prove count 2. The State contends it made an effective election because at closing argument, it "linked" count 2 to Erickson "putting his mouth on her vagina, performing oral sex on her."

As detailed above, G.C. testified that "multiple times" in the house in Granite Falls on her parents' bed Erickson "would eventually start touching me on my vagina and use his mouth to touch me too." She said, "He would use his tongue, he would use his fingers, and he would penetrate me with his fingers too." When the State stated, "You said that this happened more than one time," G.C. responded, "Yes."

The State then asked G.C. to "turn to the incidents where he used his mouth on you." G.C. remembered that he would "kiss me on it, and then use his tongue." The State asked, "Just on the outside of your vagina or ever inside?" and G.C. answered, "Inside and outside."

At closing argument, the State told the jury that "[G.C.] provided details about Count 2 occurring in the Granite Falls house . . . [and] this happened [on] more than one occasion." It argued that sexual intercourse meant "sexual contact between . . . the sex organs of one person and the mouth or anus of another." It referred to the same multiple incidents as it did for count 1 regarding digital penetration, and "her testimony about, on some occasions, he would put his tongue inside her vagina and move it around." The State referred to "instances" she had a pillow over her face, and described how "over time" G.C. moved from

16

"crying uncontrollably" to how she "got used to it." The State thus did not identify only a single act of oral sex performed by Erickson on which it relied for count 2, but rather relied on multiple acts. Because G.C. testified to many instances involving conduct that satisfied the element of sexual intercourse for rape of a child in the category of Erickson "putting his mouth on [G.C.'s] vagina," we conclude that the State did not make an effective election as to count 2.

### 3. Count 3

In count 3, the State charged that Erickson, in an act separate and distinct from the counts 1 and 2, had sexual intercourse with G.C. In its closing argument, the State specified that count 3 pertained to Erickson "making [G.C.] perform oral sex" on him. While G.C. testified that she was forced to give Erickson oral sex "multiple times," she remembered "specifically one time" that Erickson ejaculated in her mouth, she gagged, and she ran to bathroom to spit it out. She testified specifically only to that one instance; she testified that she did not remember any other specific instances of oral sex. At closing, the State referred solely to the single instance G.C. remembered.

Consequently, when the State told the jury that count 3 "pertain[ed] to her testimony about him making her perform oral sex on him," its categorical election was effective because G.C. testified she remembered only one specific incident of this type of conduct. Therefore, we conclude that Erickson's conviction on this count was not in error, as the State's election ensured unanimity.

17

B. Count 4

The elements of molestation of a child in the first degree are "sexual contact with another who is less than twelve years old and the perpetrator is at least thirty-six months older than the victim." RCW 9A.44.083. "Sexual contact means 'any touching' of the sexual or other intimate parts of person done for the purpose of gratifying sexual desire." RCW 9A.44.010(13). Jury instruction 6, which stated that the State would rely on a single act, was limited to the counts of rape of a child, and the court did not give a Petrich instruction as to the State's single count of molestation, count 4.

Erickson argues that the State "did not even try to elect for Count 4." The State argues that the prosecutor asked G.C. to describe "one of the times that stands out most clearly in her mind." Because there was evidence of multiple instances that could establish the charged crime, we agree that the failure of the State to elect or for the court to give a Petrich instruction constitutes error.

The court instructed the jury that to convict Erickson of count 4 of first degree child molestation, "[t]hat on a specific date between" August 23, 2004, and August 22, 2010, "in an act separate and distinct from those alleged in the other counts," Erickson "had sexual contact with G.C." It defined sexual contact as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party."

At closing argument, the State said that "Count 4 pertains to him making her touch his penis" without further elaboration. But G.C. testified that she touched Erickson's penis "multiple times." For example, when the State asked,

"Were there - - were there times where he had you touch him?" G.C. answered, "Yes." G.C. testified about a time at the Arlington house when Erickson, wearing boxer underwear, "grabb[ed her] hand and mov[ed] it how he was moving it on him." She remembered that "every single time" they were together downstairs at the Arlington house, Erickson would close his eyes and tell G.C. to touch him. This testimony "every single time" suggests multiple times. At closing, the State argued that "in those instances," plural, where he would have her masturbate him, the definition of sexual contact was satisfied.

"When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected." Petrich, 101 Wn.2d at 572. Here, the court gave no unanimity instruction, either a Petrich instruction or, as with counts 1, 2, and 3, an instruction that the State would make an election, despite G.C.'s testimony about multiple acts of touching Erickson's penis. Thus, we agree with Erickson that because the State did not elect and no Petrich instruction was provided, the conviction on count 4 constitutes error.

### C. Harmless Error

Without either an election or a unanimity instruction in a multiple acts case, "there is constitutional error stemming 'from the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction.' " State v. Aguilar, 27 Wn. App. 2d 905, 928, 534 P.3d 360 (2023) (quoting State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988), abrogated on other grounds by In re

19

Pers. Restraint of Stockwell, 179 Wn.2d 588, 600, 316 P.3d 1007 (2014)).
" 'Harmless error analysis then determines whether reversal is appropriate.' "
Aguilar, 27 Wn. App. 2d at 928 (quoting Kitchen, 110 Wn.2d at 409-10). The
absence of either the unanimity instruction or an effective election is "presumed
to result in prejudice." Coleman, 159 Wn.2d at 512. "The presumption of error is
overcome only if no rational juror could have a reasonable doubt as to any of the
incidents alleged." Id.

Courts "that have affirmed [convictions in] multiple acts cases despite
finding error tend to do so because there is no material difference in the evidence
supporting one act and the evidence supporting another." Aguilar, 27 Wn. App.
2d at 928. For example, in State v. Camarillo, there were three incidents: one,
where the victim had dinner at the defendant's house, second, when he spent the
night at the defendant's house, and third, when the defendant was at the victim's
house. 115 Wn.2d 60, 66-68, 794 P.2d 850 (1990). There was "no factual
difference between the incidents" and " 'besides [the defendant's] bare denial of
the allegations, there [wa]s no direct, contravening evidence concerning the
occurrence of the alleged incidents.' " Id. at 70 (quoting State v. Camarillo, 54
Wn. App. 821, 828, 776 P.2d 176 (1989)), abrogated by State v. Crossguns, 199
Wn.2d 282, 505 P.3d 529 (2022). The defendant testified on his own behalf and
denied ever touching the boy in the fashion described, and a woman who shared
the defendant's residence testified that she had never seen the defendant alone
with the victim. Camarillo, 115 Wn.2d at 68-69. "The jury was free to believe the
victim, disbelieve the defendant and give no weight whatsoever to the seemingly

irrelevant testimony of the woman." Id. at 70. The jury could consider "the totality of the evidence of several incidents to ascertain whether there is proof beyond a reasonable doubt to substantiate guilt because of the acts constituting one incident and also to believe that if one happened, then all must have happened." Id. at 71.

Similarly, in State v. Bobenhouse, Bobenhouse's son testified to "what seem to be separate incidents that are each independently capable of constituting rape of a child in the first degree," i.e., that Bobenhouse forced his son to perform oral sex on Bobenhouse and that he put his finger in his son's anus, to which Bobenhouse offered "only a general denial." 166 Wn.2d 881, 894-95, 214 P.3d 907 (2009). Because "the jury had no evidence on which it could rationally discriminate between the two incidents," if the jury "reasonably believed that one incident happened, it must have believed each of the incidents happened." Id. at 895.

But where the "jurors could have rested their finding of guilt on different episodes," the error is not harmless. Coleman, 159 Wn.2d at 513. For example, in Kitchen, a consolidated case, the court determined the errors in both Kitchen's and Coburn's cases were not harmless because "the prosecution placed testimony . . . of multiple acts in evidence. There was conflicting testimony as to each of those acts [so] a rational juror could have entertained reasonable doubt as to whether one or more of them actually occurred." Kitchen, 110 Wn.2d at 412.

Similarly, in Coleman, the defendant was convicted of molesting two children, C.V. and M.D., over a period of years. 159 Wn.2d at 511. This court had affirmed the defendant's conviction for molesting C.V. as harmless error. Id. at 511. Our Supreme Court reversed, holding "that it was not harmless error to fail to give a unanimity instruction where the State introduced evidence of distinguishable acts that could satisfy the crime charged." Id. at 516-17. The court reasoned that "[t]he facts support the State's concession that there was evidence of multiple incidents . . . and that testimony was inconsistent as to at least one incident involving C.V." Id. at 514. A social worker testified that the defendant touched C.V. during a particular movie, but that testimony was contradicted by a school counselor's testimony that C.V. told her "nothing really happened" at that movie, and C.V. denied at trial that anything happened at the movie. Id. The court reasoned that the evidence heard by the jury supported "both that the movie incident was a discrete act and that whether it occurred is controverted." Id.

Likewise, in Aguilar, the defendant admitted to sexual intercourse both on a couch in one room and in the bedroom, and "some of his arguments about the weight of evidence and [the victim's] testimony go to one act, some go to the other, and the jury could therefore differentiate between them." 27 Wn. App. 2d at 930. Because the jury had more evidence to weigh and consider beyond only the victim's testimony countered by defendant's blanket denial, "a rational trier of fact could find that reasonable doubt exists as to one or both of the acts that served as the basis of the rape charge." Id.

Here, the State argues that its failures to effectively elect for counts 1 and 2 or to instruct or elect for its molestation charge, count 4, were nonetheless harmless. First, citing no authority, it contends that the court's unanimity instruction, "you must unanimously agree that this specific act was proved," ultimately ensured jury unanimity because no rational jury would disregard the prosecutor's comment to the jurors that they must be unanimous. This argument does not, however, address the proper harmless error analysis, which requires engaging with the evidence that could have controverted any of the multiple acts that could have proved each count.

The State also argues its failure to elect was harmless because this was an "all-or-nothing case" where if the jury believed one incident occurred, all incidents must have occurred. Erickson counters that as to each count, the State's errors were not harmless because G.C. was "not clear about the time and circumstance of each alleged act" and there were contradictory statements.

As discussed above, G.C. testified to multiple acts that could prove the crime of rape of a child in the first degree as to both count 1, Erickson's digital penetration of G.C., and count 2, his performing oral sex on G.C. Regarding count 1, in addition to G.C.'s testimony, the jury heard G.C.'s mother testify that, as to one instance, Erickson "did not deny it" because he "scratched her there" putting diaper medicine on her while looking away. While this testimony may pertain to only one of multiple incidents, it is not controverting; it is corroborative of G.C.'s testimony. Similar to Camarillo, where the victim's mother provided corroborative evidence that placed the child with the defendant on one of three

23

nights of alleged unlawful activity, Camarillo, 115 Wn.2d at 67 n.7, here, the corroborating evidence as to one instance of activity charged in count 1 does not provide a rational basis to distinguish among the acts. The error as to count 1 is harmless beyond a reasonable doubt.

As to count 2, Erickson's performing oral sex on G.C., G.C. testified to multiple incidents and at closing, the State told the jury count 2 occurred "in the Granite Falls house" on "more than one occasion," and also after they moved to the Arlington house, when Erickson would "com[e] into [G.C.'s] room at night." While these multiple incidents are distinct because they were alleged to have occurred in different locations, there is no " 'direct, contravening evidence' " concerning any of the alleged incidents. Camarillo, 115 Wn.2d at 70 (quoting Camarillo, 54 Wn. App. at 828). When "the jury ha[s] no evidence on which it could rationally discriminate between the [multiple] incidents," if the jury "reasonably believed that one incident happened, it must have believed each of the incidents happened." Bobenhouse, 166 Wn.2d at 895. The jury heard no evidence that would allow it to differentiate among the multiple incidents of oral sex to which G.C. testified. We conclude that regarding counts 1 and 2, as no rational trier of fact could have a reasonable doubt as to any of the incidents alleged, the State's failure either to instruct on unanimity or to elect a specific act was harmless error.

As to count 4 of molestation, Erickson points to factual disputes regarding two issues: whether Erickson was circumcised[11] and whether there was a recliner chair where G.C. claimed some of the acts occurred. The State argued that Count 4 pertained to Erickson "making [G.C.] touch his penis," which it alleged happened multiple times. G.C. described Erickson's "uncircumcised disgusting penis." However, the record also contains evidence that Erickson was circumcised, including the testimony of Erickson's mother and his subsequent wife, a photograph, and the testimony of the policer officer who took the photograph. Based on this evidence, Erickson argued that the charged acts were committed by someone other than him. Although this is controverting evidence, as to count 4 it is a "general denial" that does not allow the jury to differentiate any one specific alleged act from another that could prove count 4.

Regarding the recliner, G.C. testified Erickson made her touch him "multiple times" and that "one of the times that stands out" was at the Arlington house, when Erickson made her touch him while he sat in a recliner. G.C.'s mother testified that the Arlington house held "a big L-shaped couch," not a recliner. And G.C. testified that there was a recliner at her biological father's house. But when the State asked if Erickson made her touch him in "any other place than that place, sitting in that chair in the living room?" G.C. testified "[n]ot that I remember, no." Thus, the jury did not hear testimony from "which it could rationally discriminate between the [multiple] incidents" alleged to prove

---

[11] This evidence does not controvert the evidence of counts 1 and 2 because the State limited those counts to conduct that did not involve Erickson's penis—digital penetration and Erickson performing oral sex on G.C., respectively.

molestation of a child, so we conclude that, regarding count 4, no rational trier of fact could have a reasonable doubt as to any of the incidents alleged. Therefore, regarding count 4, the State's failure to elect and the lack of a Petrich instruction was harmless error.

II.        Denial of Trial Continuance

Before his second trial began in 2021, Erickson moved to continue the trial "due to current indoor masking requirements" because opaque face masks "interfere with a defendant's ability to view a juror's face, it interferes with the juror's ability to see the defendant's face, and it interferes with the ability for all involved to view facial expressions, which are critical to jury selection." He argued his trial would be fair only "if no one is wearing a mask." The court denied his continuance. On appeal, Erickson contends that because he was "forced . . . to go to trial in the middle of a pandemic," not only was this ruling an abuse of discretion, it denied him his constitutional rights to due process and to a fair jury trial.

Erickson argues that "the masking of jurors is a specific prejudice caused by the [court's] denial" of his motion to continue his trial until "no one is wearing a mask." In other words, he does not raise the mask requirement as a "free-standing" assignment of error, but, rather, argues that it "is an element of the prejudice caused by the decision to hold a trial during a pandemic."[12] The State counters that the court did not abuse its discretion in denying a trial continuance,

_____

[12] Erickson concedes that while the pandemic impacted who appeared in response to a jury summons, thus impacting his right to a jury representing a fair cross-section of the community, "this issue is not an independent basis for relief, based upon the lack of complete record." Amended Br. of Appellant at 35.

and even if it did, Erickson has not shown how the outcome of his trial would have been different. We agree with the State.

In both criminal and civil cases, the decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. State v. Downing, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). In deciding a motion for continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure. Id. at 273. In a child sex case, trial courts must also compare any detriment to a child victim that might be caused by a continuance with the compelling reasons for continuing the trial. See RCW 10.46.085.

This court reviews a trial court decision on whether to grant a continuance for abuse of that discretion. Downing, 151 Wn.2d at 272. In other words, a trial court's decision will only "be disturbed only upon a showing that the accused has been prejudiced and/or that the result of the trial would likely have been different had the continuance not been denied." State v. Deskins, 180 Wn.2d 68, 82, 322 P.3d 780 (2014) (quoting State v. Eller, 84 Wn.2d 90, 95, 524 P.2d 242 (1974)).

This court has held that a trial court does not abuse its discretion by requiring jurors to wear nontransparent face masks during COVID-19.[13] State v. Bell, 26 Wn. App. 2d 821, 838, 529 P.3d 448 (2023). Thus, the masking requirement could not alone establish the prejudice required to disturb the trial court's denial of the continuance. Further, under RCW 10.46.085, the court was

---

[13] The masks in question were nontransparent masks that obscured the wearer's nose and mouth. Bell, 26 Wn. App. 2d at 826. The court considered cloth, surgical, and N-95/KN-95 masks as nontransparent masks. Id. at 832.

obligated to compare any detriment to G.C. along with compelling reasons to continue the trial. While Erickson suggests G.C. may have also benefitted from a continuance, G.C. testified, to the contrary, that another continuance would be "exhausting" and she just wanted the trial "to be done as soon as possible." Erickson does not argue that a continuance would have helped him produce any missing material evidence. See RCW 10.46.080. Nor does he suggest how his second trial's outcome would have been any different had his continuance been granted. See Deskins, 180 Wn.2d at 82.

While Erickson also contends that the denial of the continuance and proceeding with a trial during the COVID-19 pandemic "led to a series of violations of the right to open and public courts," none of which would have happened "during a normal trial." But Erickson does not provide legal authority for why the denial of the continuance itself establishes a constitutional violation separate from those claims, which we address below. Therefore, we conclude that the trial court did not abuse its discretion in denying the continuance, nor does Erickson establish any constitutional violation based on this denial.

III.     Right to Public Trial and Right to Be Present

Erickson argues several bases for his claim of violation of his right to a public trial: the court held jury selection in the jury assembly room, jury selection decisions were made in chambers, and the courtroom was closed during trial testimony. After filing this appeal, Erickson moved to remand his case to complete the record, and a commissioner of this court permitted him to amend his opening brief so he could argue for the remand. Erickson argues that if the

current record does not support his argument, then his motion to remand must be granted.

Under Washington's Constitution, article I, section 22, criminal defendants have the right to a public trial. State v. Gomez, 183 Wn.2d 29, 33, 347 P.3d 876 (2015). The right can be raised for the first time on appeal, where the alleged violation will be reviewed de novo. State v. Brightman, 155 Wn.2d 506, 514, 122 P.3d 150 (2005). We use a three-step framework for analyzing whether a trial court violated the right to a public trial. Gomez, 183 Wn.2d at 33. First, we determine, based on "experience and logic," whether the portion of the proceeding at issue implicated the right. Id. Next, we ask if there was a closure. Id. A closure occurs "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." Id. (quoting State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)). And finally, we look for whether an on-the-record analysis of the Bone-Club[14] criteria justified the closure. Id.

A. Jury Assembly Room

Because of COVID-19, no other jury was being selected when it was time to select Erickson's jury. The court therefore planned to use the larger jury assembly room instead of the usual room, the "Drewel room." This was "somewhat better," the court explained, because in the Drewel room, "[i]t's very hard to hear every time a bus goes by."

---

[14] State v. Bone-Club, 128 Wn.2d 254, 258, 906 P.2d 325 (1995).

The court asked the parties to plan to stipulate to a venire of 35 so that voir dire could be conducted one time instead of multiple times. The court noted that the jury assembly room seated 45 but that "we're going to need to have some public seating, at least a little bit."

The following month, in an on-the-record post-trial discussion of whether to seal the completed jury questionnaires, the court stated that "[t]his courtroom has been open through the entire trial, and people have been coming and going." The court noted that, "the public has seen an airing of the various issues that found their way into these completed questionnaires."

Erickson argues that unless the record shows the jury assembly room "was in fact accessible to the public," then his conviction should be reversed. The parties do not dispute that Erickson's right to a public trial extends to voir dire, but the State argues there was no closure. We conclude that the record does not show that the use of the jury assembly room resulted in any closure of Erickson's trial during voir dire.

Erickson provides no citation to the record for his assertion that the jury assembly room was inaccessible to the public. It is Erickson's burden to "supply[ ] a record that is sufficient to show that the proceeding in question was actually closed," meaning " 'completely and purposefully closed to spectators so that no one may enter and no one may leave.' " Gomez, 183 Wn.2d at 33-34 (quoting Lormor, 172 Wn.2d at 93)). Erickson seeks to transfer this burden to the State. But the case he cites, State v. Waits, deals with the particular circumstance of a lost or damaged record. 200 Wn.2d 507, 511, 520 P.3d 49

(2022) (trial transcript contained 1,500 "inaudible" notations because trial was conducted in a former church during COVID-19).

In Waits, the court concluded that "when a defendant appeals their conviction and the record is lost or damaged, the State bears the burden of reconstructing the record in a criminal appeal." 200 Wn.2d at 519-20. Here, to the contrary, the record shows that the court was mindful of the need to provide for public seating for voir dire and stated that "people have been coming and going" throughout the entire trial.[15] Therefore, we conclude that Erickson does not show that the court's use of the jury assembly room resulted in a complete closure during voir dire or a violation of Erickson's public trial right.

### B. Discussion of Juror 27 in Chambers

Erickson complains that a meeting discussing whether to excuse juror 27 was not recorded, and "the judge did not put the full contents of the meeting on the record until days later." Erickson argues that this failure violated his right to a public trial.

On Tuesday, November 23, 2021, just before the Thanksgiving holiday, juror 27 was questioned in open court. The juror raised her hand to request a hardship dismissal as she was her family's sole income provider and because of a planned vacation. Neither Erickson or the State had any additional questions for the juror.

---

[15] Attached to Erickson's opening brief is his counsel's affidavit testifying that while she has "no memory of what signage was on the doors of the Jury Assembly Room while we were conducting jury selection in November 2021," months later, in August 2022, access to the jury assembly room was restricted to "Staff and Jurors Only." This evidence is not probative of any courtroom restrictions in place during Erickson's trial.

On Wednesday morning, when court resumed at 9:24 a.m., the court announced that "for the record, I have met with the attorneys, and they agree that Juror 27 may be excused for hardship and I think also cause. And so I have excused Juror 27."

The next court day, the Monday after Thanksgiving, out of the presence of the jury but in the courtroom, the court announced that a "number of things . . . need to put on the record."

> I'm going to start, and then I'll invite each side to make sure that the record is complete. Last Wednesday, when we were using the jury assembly room . . . I met with all three counsel in chambers to inform them that Juror 27 had e-mailed to say that she had a urinary infection and was in urgent care and in pain and had a need for frequent urination. And . . . both sides indicated that I could excuse Juror 27 for cause or hardship; I don't recall whether there was even a differentiation. I think I was invited to decide which it was, and, frankly, I think it's probably both.

The court also noted that the courtroom to which trial would be assigned had room for the regular 14 jurors, and each side would have the regular six peremptory challenges plus a challenge each to each alternate for a total of eight. The judge invited either party to "add, subtract, or change" the record it had just made, but neither did.

Erickson argues that the meeting about juror 27 was not recorded, and "the judge did not put the full contents of the meeting on the record until days later." However, "hardship determinations do not implicate the concerns underlying the public trial right, at least where no juror was excused for hardship without further (on-the-record) proceedings unless all parties agreed." State v. Schierman, 192 Wn.2d 577, 608, 438 P.3d 1063 (2018). Nor did Erickson object

when the court placed its hardship dismissal decision on the record. See id. at 614 (in the context of closure, "[w]hile a defendant need not object to a courtroom closure in order to preserve the issue for direct appeal, the lack of objection is some indication that the trial remained fundamentally fair") (citing Weaver v. Massachusetts, 582 U.S. 286, 299, 137 S. Ct. 1899, 198 L. Ed. 2d 420 (2017); cf. State v. Slert, 186 Wn.2d 869, 875, 383 P.3d 466 (2016) (defendant not entitled to relief if defendant waived appellate review by not properly preserving the error claimed on appeal). Here, we agree with the State that Erickson's right to a public trial was not implicated by the court's deciding juror 27's hardship dismissal in chambers because the parties agreed and the circumstances were set out in the record soon thereafter.

Erickson also complains that he, as opposed to his counsel, was not present when the court met counsel in chambers. "A criminal defendant has a fundamental right to be present at all critical stages of a trial." State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). As for the right to be present during voir dire, hardship determinations, "which decide 'whether a juror is able to serve at a particular *time* or for a particular *duration*[,]' differ fundamentally from peremptory or for-cause challenges[,] which determine a particular juror's ability to serve as a neutral factor in a particular *case*." Schierman, 192 Wn.2d at 608 (quoting State v. Russell, 183 Wn.2d 720, 730, 357 P.3d 38 (2015)). While the defendant's constitutional right to be present "clearly attaches to for-cause challenges during voir dire," hardship determinations "do[] not implicate any constitutional interest." Id. at 603. We review violations of the right de novo. Irby, 170 Wn.2d at 880.

Here, Erickson was present when juror 27's ability to serve as a neutral trier of fact was examined in open court. She requested a hardship dismissal, and Erickson had no further questions for the juror. While he was not present when juror 27's hardship dismissal was discussed and granted by the court in chambers, that dismissal did not implicate Erickson's constitutional interests. See Schierman, 192 Wn.2d at 603. We conclude the court's decision regarding juror's hardship dismissal in chambers violated neither Erickson's constitutional right to a public trial nor his right to be present at all critical stages.

C. Public Courtroom Access

Erickson argues the court "close[d] the courtroom during substantial portions of the trial," and there was no Bone-Club analysis on the record, so his conviction must be reversed because prejudice is presumed. The State argues that Erickson's claim was explicitly rejected in Gomez, 183 Wn.2d at 36. We agree with the State.

In a motion in limine, Erickson argued that the public should have "unfettered access" to the courtroom as long as they were properly masked during the COVID-19 pandemic. The court granted the motion to the extent that the public would not be limited to viewing proceedings over "YouTube or Zoom." But it denied the motion as to a sign the court planned to hang on the door "which will have the intended purpose of preventing members of the public from interrupting the proceedings to get to the jury box" where the public would be seated during Erickson's trial. The court explained it was going do "what they do at the opera":

> There will be a sign on the door that says you may come in during recesses but not while court is in session. Similarly, they can leave during recesses but not while court is in session. What I'm hoping to avoid is people coming and going and blocking things and preventing a juror from seeing or hearing something or preventing a lawyer from seeing or hearing something or otherwise interrupting the trial or preventing somebody from getting a fair one.

The record does not show whether any sign was in fact posted.

Applying the Gomez three-step framework for analyzing whether a trial court violated the right to a public trial, the parties do not dispute that the trial itself is a proceeding that implicates the public trial right. Rather, the issue is regarding the second step, whether the court's plan constituted a closure.

In Gomez, couched within a lengthy explanation for denying the defendant's motion to change venue, the trial court had stated it would "not allow people to come into the courtroom after [it] is in session." 183 Wn.2d at 32. The Gomez court "agree[d] with this analysis; short of an explicit order to close the courtroom, we do not presume that the entire public was effectively prohibited from entry. The record must establish that the courtroom and proceedings were closed by express direction of the judge." Id. at 35. Here, the record shows that the public *did* attend Erickson's trial. The State mentioned in its closing, "[G.C.] had her basketball team. And you may have seen some of them here watching her and supporting her." The court had to encourage other visiting students to maintain social distancing during COVID-19. Thus, the record shows that the court did not completely close the courtroom so that no one could enter or leave.[16] We agree with the State that there was no closure.

---

[16] Because there was no complete closure, no Bone-Club justification was required. State v. Smith, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014).

Erickson requests that we remand for fact-finding about whether the jury assembly room was inaccessible, whether the judge put a sign on the door "barring" the public, and whether there was an in-chambers conference during jury selection. He argues that "[u]ltimately, if there is any issue about the adequacy of the record . . . the [c]ourt should remand the case for a hearing to make the record complete."

Erickson, however, ignores the clear directive of one of the cases he cites in support, State v. Koss: "the appellant bears the responsibility to provide a record showing that such a closure occurred in the first place." 181 Wn.2d 493, 503, 334 P.3d 1042 (2014). Nor does State v. Andy, 182 Wn.2d 294, 340 P.3d 840 (2014), support Erickson. The court stated the same standard: "When defendants assert public trial rights violations, they have the burden to show that a courtroom closure occurred." Id. at 305. In Andy, unlike here, defendant met that burden because trial transcripts showed the trial continued after business hours, potentially giving rise to a closure. Id. at 299. In the present case, Erickson has not provided any record evidence that any closure happened in the first place.[17] Thus, we deny Erickson's motion to remand.

IV.    Evidence Excluded Under ER 608(b)

Erickson argues the trial court erred when it did not allow him to cross-examine Lieutenant Murphy, and this violated his rights under the confrontation

---

[17] At oral argument, Erickson argued the Cassie Trueblood declaration and an e-mail from the judge provided a basis for an inference. Neither the declaration nor the e-mail are part of the record before us on appeal. Washington Court of Appeals oral argument, State v. Erickson, No. 837583 (Sept. 13, 2023) at 1 min., 25 sec. through 2 min., 0 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023091170/?eventID=2023091170.

clause and his right to present a defense.[18] The State argues the court ruled properly that because the incident was not probative of truthfulness, Erickson waived the constitutional confrontation clause claim, and the exclusion did not prevent Erickson from presenting a defense. We agree with the State.

The record includes a letter from the prosecuting attorney of neighboring Whatcom County with a subject line reading "Potential Impeachment Disclosure Determination," regarding a prosecution witness, Bellingham Police Department Murphy, who it determined "was not candid in applying for a search warrant" in 2009. The letter explains Murphy used a "ruse" in order to search an apartment without revealing that one of the apartment's residents was the daughter of a police officer from a different jurisdiction. Murphy did not disclose the ruse to a magistrate when she subsequently applied for a search warrant. The letter was "generated to provide the defense notice of this potential impeachment issue."

The trial court ruled that the letter itself, extrinsic evidence offered to prove a specific instance of conduct, was not admissible to impeach Murphy's reputation for truthfulness under ER 608(b). The court also ruled that Murphy could not be cross-examined about that instance of her conduct either, because

---

[18] The failure to assert the right to confrontation at trial results in a waiver, precluding appellate review of the constitutional issue. State v. Burns, 193 Wn.2d 190, 211, 438 P.3d 1183 (2019). Erickson argues he did not waive any confrontation clause violation because he objected at trial to the exclusion of the evidence, and he attempts to distinguish Burns. But Burns is clear that the failure to assert the right to confrontation at trial results in a waiver, precluding appellate review of the constitutional issue. Id. Erickson alternatively suggests "if counsel did not make the objection fully, they were ineffective." However, as he does not provide argument on the ineffective assistance claim, we do not address it. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

"[t]he use of a ruse by a police officer cannot be indicative of truthfulness or untruthfulness," so "there's no way it can be relevant."

The federal and state constitutions guarantee the right "to conduct a meaningful cross-examination of adverse witnesses." State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). But this is not " 'an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.' " State v. Lizarraga, 191 Wn. App. 530, 553, 364 P.3d 810 (2015) (quoting Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)). The right to present a defense is limited by the general rules of evidence. State v. Carte, 27 Wn. App. 2d 861, 877, 534 P.3d 378 (2023) (citing Darden, 145 Wn.2d at 621).

Thus, for claimed violations of the Sixth Amendment right to present a defense, we engage in a two-step process of review. State v. Arndt, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). First, a trial court's evidentiary rulings are reviewed for abuse of discretion. State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. Id. at 59. Second, if the trial court did not abuse its discretion, the reviewing court reviews de novo whether the exclusion of evidence nonetheless violated the defendant's right to present a defense. Id. at 58. The test asks "(1) whether the excluded evidence was at least minimally relevant, (2) whether the evidence was 'so prejudicial as to disrupt the fairness of the factfinding process' at trial, and, if so, (3) whether the State's interest in excluding the prejudicial evidence outweighs the defendant's need to present it."

State v. Orn, 197 Wn.2d 343, 353, 482 P.3d 913 (2021) (quoting State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)). Constitutional error " 'is harmless and not grounds for reversal [only] if the appellate court is assured [by the State] beyond a reasonable doubt that the jury would have reached the same verdict without the error.' " Orn, 197 Wn.2d at 359 (quoting State v. Romero-Ochoa, 193 Wn.2d 341, 347, 440 P.3d 994 (2019)).

ER 608(b) prohibits the use of extrinsic evidence to prove specific instances of the conduct of a witness for the purpose of attacking or supporting the witness's credibility. However, a court may allow inquiry into such instances on cross examination, if probative of truthfulness or untruthfulness. ER 608(b). Erickson asserts that the trial court erred because "[t]his type of dishonesty in a court proceeding is highly probative of a police officer's lack of credibility." But he makes no substantive rule-based argument.[19] Instead, he argues that the court abused its discretion if it violated his constitutional rights.

Turning to the second step of the Arndt analysis, we examine whether being deprived of the opportunity to cross-examine Murphy about the ruse incident violated Erickson's constitutional right to present a defense. Erickson

---

[19] Erickson cites two cases, but makes no substantive argument regarding either, and the lack of a reasoned argument is insufficient to merit judicial consideration. Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996). Unlike Murphy's prior conduct in a case other than Erickson's, the court in State v. Gregory emphasized that the trial court abused its discretion because there, the statement excluded by the court under ER 608(b) "was a very *recent* lie in response to questioning from defense counsel in the context of *this case*," and was "relevant to this case." 158 Wn.2d 759, 799, 147 P.3d 1201 (2006). And the federal habeas precedent cited by Erickson was not an ER 608(b) case; it involved the prosecution's failure to disclose evidence as required under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). See Milke v. Ryan, 711 F.3d 998, 1012-13 (9th Cir. 2013) (Maricopa County prosecutors failed disclose that the investigating Phoenix Police Department officer at issue had been suspended and had "lied under oath in order to secure a conviction" in the past).

sought to impeach Murphy to show her bias, *i.e.*, that "when she takes personal interest in cases or feels that they are personal for her, she doesn't necessarily follow the rules." "A witness's bias is 'always relevant.' " Orn, 197 Wn.2d at 353 (quoting Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974)). But prohibiting Erickson from questioning Murphy about the use of a ruse when applying for a search warrant in another case did not prevent Erickson from challenging Murphy's bias and credibility in other ways. Indeed, Erickson impeached Murphy regarding her bias as a board member of the victim support agency that supported G.C. after she revealed her abuse to her basketball coach and a counselor at the agency. Erickson also impeached Murphy regarding her qualifications to interview G.C., if she had a proclivity to question G.C. in a leading manner, and whether she was too eager to believe G.C. Because Erickson was able to impeach Murphy for bias in other ways, we conclude that not allowing Erickson to cross examine Murphy about the ruse did not deprive him of his constitutional right to present a defense.

Erickson also suggests his trial counsel may have been ineffective in failing to object to the trial court's exclusion of the ruse impeachment evidence on constitutional grounds. But he makes no substantive ineffective assistance of counsel argument, and this court does not consider insufficiently argued claims. See State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990).

V.      Admission of Character Evidence

Erickson argues that State witnesses testified to G.C.'s good character and turned his "trial into a popularity contest." The State argues Erickson did not

40

object below, and the State needed to respond to Erickson's attempts to impeach G.C. as having fabricated the abuse because she was attention-seeking. We agree with the State.

Generally, appellate courts may, and do, refuse to review any claim of error not raised below. RAP 2.5(a). Below, the State moved in limine to exclude evidence of Erickson's good character or G.C.'s poor character, and Erickson agreed. At trial, the State presented evidence of G.C.'s good character. Jessica Erickson, G.C.'s mom, said she was a "great kid" who did not get into trouble to get attention. Drew Bryson, a former boyfriend, said G.C. was "so well put together" and "an overall great person." G.C.'s friend Selena Gutierrez said G.C. was not "well liked by everybody, had a lot of friends," but she "wouldn't consider her attention-seeking." G.C's college basketball coach said G.C. was a "great kid." Detective Ambrose said G.C. and her friends were "a great group of kids." Erickson did not object to any of this testimony.

Here, Erickson argues that an exception to RAP 2.5(a) applies because the State deliberately disregarded the court's rulings on motions in limine, because of prosecutorial misconduct, or because of ineffective assistance of counsel. While Erickson contends the State "deliberately introduced character evidence" after moving to exclude character evidence, the motions in limine excluded evidence of G.C.'s *poor* character, not her *good* character. Consequently, we conclude the exception to RAP 2.5(a) does not apply.

Erickson's prosecutorial misconduct and ineffective assistance of counsel arguments depend on his argument that the prosecutor deliberately disregarded

the court's rulings on motions in limine, and so both fail for the same reason. <u>Cf.</u> <u>State v. Weber</u>, 159 Wn.2d 252, 273, 149 P.3d 646 (2006) (State conceded prosecutorial misconduct). Therefore, relying on RAP 2.5(a), we decline to review testimony to which Erickson did not object to below.

    Affirmed.

_Chung, J._

WE CONCUR:

_Díaz, J._

_Smith, C.J._